**UNITED STATES of America,
Plaintiff,**

v.

**STATE OF ALASKA, Defendant.**

**No. A-45-67.**

United States District Court,
D. Alaska.

Dec. 14, 1972.

G. Kent Edwards, U. S. Atty. of Alaska, Anchorage, Alaska, Edward F. Bradley, Jr., Dept. of Justice, Washington, D. C., for plaintiff.

John E. Havelock, Atty. Gen. of Alaska, State of Alaska Dept. of Law, Civil Div., Anchorage, Alaska, for defendant.

MEMORANDUM AND ORDER

VON DER HEYDT, District Judge.

The above cause, long standing in this district, was tried to the Court in January, 1972. The issues presented for the Court's determination are exceptionally complex. Literally hundreds of exhibits were received into evidence, which, together with the testimony of numerous witnesses and the voluminous trial and post trial briefs of the parties, have required the extensive attention of the Court. The cause has been under ad-

visement since the end of July of 1972, when the final post trial brief was filed.

While the Court has spent considerable time with all aspects of the evidence as it relates to the legal issues, a discussion of only the major contentions is included here.

Both parties have submitted, pursuant to the Court's request, their proposed findings of fact, conclusions of law and judgment form. These, too, have been carefully considered by the Court.

In April of 1967 the State of Alaska offered in a competitive oil and gas lease sale a tract of submerged land located beneath lower Cook Inlet. A month later the United States disputed the ownership of the resources lying beneath lower Cook Inlet by commencing this action to quiet title.

The apportionment of subsurface resources between a littoral state and the United States has long been the subject of intensive litigation. In United States v. California, 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947) the Supreme Court held that rights to subsurface resources lying beneath the three mile territorial sea are vested exclusively in the United States. In response to that ruling, Congress enacted the Submerged Lands Act of 1953. 43 U.S.C. § 1301. That act not only granted to a coastal state exclusive rights to subsurface resources located beneath the territorial sea, but it granted identical rights to subsurface resources located beneath inland waters. Unfortunately, Congress did not define "inland waters" as that term appeared in the Submerged Lands Act. It was not until United States v. California, 381 U.S. 139, at 164, 85 S.Ct. 1401, 14 L.Ed.2d 296 (1965) that the term "inland waters" of the Submerged Lands Act was subject to judicial interpretation. In that case, the Court adopted the definitions of inland waters set forth in terms of international law in the Convention of the Territorial Seas and the Contiguous Zone (T.I.A.S. No. 5639).

The Convention established rules of international law for determining the location of the baseline from which the territorial sea of a nation is measured. Waters located landward of such a baseline are to be considered inland waters of the coastal nation. Pursuant to the Submerged Lands Act, the resources underlying the waters located landward of such a baseline would be vested exclusively in the coastal state. The rule concerning inland bays is found in Article 7 of the Convention. Essentially the Convention sets forth a twofold requirement for a finding that a bay is a part of the inland waters of a littoral nation: (1) the indentation shall be of such curvature that its area is larger than the area of a semicircle whose diameter is a line drawn across the mouth of the indentation, and (2) the distance between headlands of the bay shall not exceed 24 miles. It is apparent that the latter requirement is not satisfied as to lower Cook Inlet. However, paragraph 6 of Article 7 of the Convention states that "the foregoing provisions shall not apply to so-called 'historic' bays."

It is that historic bay exception of the Convention which is the focus of the complex controversy presently before the Court. If lower Cook Inlet is a historic bay within the meaning of the Convention, that body of water is thus inland water within the meaning of the Submerged Lands Act, with the result that the State of Alaska would have exclusive rights to the subsurface resources.

Since the Convention does not define the term "historic bays", resort must be made to general principles of international law. In United States v. Louisiana, 394 U.S. 11, at 23, 89 S.Ct. 773, 22 L.Ed.2d 44 (1969), the Court footnoted with apparent approval a test for determining the existence of historic waters. The requirements were set forth in a United Nations study recommended by the International Law Commission:

There seems to be fairly general agreement that at least three factors

have to be taken into consideration in determining whether a State has acquired historic title to a maritime area. These factors are: (1) the exercise of authority over the area by the State claiming the historic right; (2) the continuity of this exercise of authority; (3) the attitude of foreign states. First, the State must exercise authority over the area in question in order to acquire a historic title to it. Secondly, such exercise of authority must have continued for a considerable time; indeed it must have developed into a usage. More controversial is the third factor, the position which the foreign States may have taken towards this exercise of authority. Some writers assert that the acquiescence of other States is required for the emergence of an historic title; others think that absence of opposition by these States is sufficient. Juridical Regime of Historic Waters, Including Historic Bays, 2 Y.B. Int'l L. Comm'n 1, 13, U.N.Doc. A/CN.4/143 (1962) [hereinafter cited as Juridical Regime]

At this juncture it should be noted that the Supreme Court has imposed certain modifications to the application of general principles of international law used in the determination of historic waters.

The first modification pertains to the vantage point to be assumed by a court in judging the facts concerning the status of a bay as historic waters. In United States v. Louisiana, 394 U.S., at 77, 89 S.Ct. 773, 22 L.Ed.2d 44, the Court indicated that such a controversy should be viewed as if the claim were being made by the United States and opposed by another nation.

The second modification concerns the degree to which a coastal state may rely on its own assertions of sovereignty over disputed waters to establish historic title. In United States v. Louisiana, *Id.* the Court made clear that state exercises of dominion, as distinguished from federal assertions of sovereignty, may

properly be considered on the issue of historic title.

The third modification pertains to the legal effect of a disclaimer by the United States that disputed waters are historic waters. In United States v. California, 381 U.S., at 175, 85 S.Ct., at 1421, the Court ruled that a disclaimer by the United States was decisive in view of the "questionable evidence of continuous and exclusive assertions of dominion over the disputed waters." But the Court also stated at that point:

> We are reluctant to hold that such a disclaimer would be decisive in all circumstances, for a case might arise in which the historic evidence was clear beyond doubt. *Id.*

In United States v. Louisiana, 394 U.S., at 77, 89 S.Ct., at 809, the Court elaborated on its position by stating:

> (I)t would be inequitable in adapting the principles of international law to the resolution of a domestic controversy, to permit the National Government to distort those principles, in the name of its power over foreign relations and external affairs, by denying any effect of past events.

In a footnote to that excerpt, the Court further limited the legal effect of a disclaimer:

> It is one thing to say that the United States should not be required to take the novel, affirmative step of adding to its territory by drawing straight baselines. It would be quite another to allow the United States to prevent recognition of a historic title which may already have ripened because of *past* events but which is called into question for the first time in a domestic lawsuit. The latter, we believe, would approach an impermissible contraction of territory against which we cautioned in United States v. California. *Id.*

The disclaimers in the instant case approach the impermissible contraction of authority cautioned against by the Supreme Court, especially in view of the clear evidence of continuous assertions

of sovereignty over lower Cook Inlet. Considering the circumstances under which they were prepared, the Court assigns a low reliability factor to the disclaimers. The first disclaimer was a letter from the Legal Advisor to the Secretary of State. The Court finds the evidence to show the disclaimer to have been hastily prepared and based on questionable research. The second disclaimer was also a letter from the State Department. That disclaimer was prepared two years after the commencement of this action, and was vulnerable to self-serving interests.

The final qualification concerns the quantum of proof required for a showing of historic title. The expression "clear beyond doubt", as it first appeared in United States v. California, 381 U.S., at 175, 85 S.Ct. 1401, could very well not have been intended by the Supreme Court to establish such a high standard of proof in all cases. The context in which that phrase appeared pertained to the legal effect of a disclaimer by the United States in the face of questionable evidence of historic title. The context of this case is clearly distinguishable. Further, there is other language in that case which implies that no rigorous standard of proof is required to prove historic title. 381 U.S., at 174, 85 S.Ct. 1401. Nor do the long respected commentators of international law appear to require a rigorous standard of proof. Juridical Regime 158. Despite this uncertainty over the burden of proof, this Court will adhere to the higher standard of proof, for the reason the Court finds the State of Alaska has satisfied the requirements for establishment of historic title even under the more rigorous standard.

The first requirement for establishing historic title to disputed waters is the effective exercise of authority over the area by the nation claiming the historic right. Juridical Regime 80. The authority which a nation must exercise over a maritime area in order to be able to claim it as historic waters is sovereignty. *Id.* 85. It is not necessary that a nation exercise all rights and duties which are included in the concept of sovereignty. *Id.* 88. Among the acts by which sovereignty is exercised are those which deny to foreign fishing vessels the right to fish in the disputed waters:

> What acts under municipal law can be cited as expressing its desire to act as a sovereign? . . . There are some acts which are manifestly not open to any misunderstanding in this regard. The State which forbids foreign ships to penetrate the bay or to fish therein indisputably demonstrates by such action its desire to act as the sovereign. *Id.* 90.

The commentators of international law appear to be in full agreement that the sovereignty must be effectively exercised. That is, the intent of the nation making the claim to historic title must be expressed by deeds and not merely by proclamations. *Id.* 98. However it is not necessary for the nation making the historic claim to undertake particular acts of enforcement if the laws and regulations were respected by foreign nations. *Id.* 99. It is only required that if an act of enforcement was necessary to maintain sovereignty, that such action was taken. *Id.*

The State of Alaska has produced evidence which establishes clear beyond doubt that there has been such sufficient exercise of authority over lower Cook Inlet.

The earliest clear assertion of sovereignty over the disputed waters occurred in 1906 when Congress enacted the Alien Fishing Act. Act of June 14, 1906, ch. 3299, 34 Stat. 263. That Act prohibited fishing by aliens in the waters of Alaska under the jurisdiction of the United States, and permitted search and seizure of foreign vessels engaging in the proscribed activity. Testimony of witnesses who enforced that Act in Cook Inlet established that all of Cook Inlet landward of a line extending from Cape Douglas to Point Gore, including the Barren Islands, was treated as part of the waters of Alaska. The witnesses tes-

tified further that they did not recall ever seeing any foreign fishing vessels in lower Cook Inlet, and if they had, they would have taken affirmative action.

Another assertion of sovereignty occurred on November 3, 1922, when President Harding created the Southwestern Alaska Fisheries Reservation by Executive Order. The administrative regulations promulgated pursuant to the executive order described Cook Inlet as that area "north of the latitude of Cape Douglas . . . including the Barren Islands . . . and all the shores and waters of Cook Inlet." Dept. of Commerce Cir. No. 251, p. 8, 9th ed. (Jan. 9, 1923). The evidence was clear that lower Cook Inlet was patrolled, and that several acts of enforcement occurred involving American fishing vessels.

The effort which began in 1922 culminated in 1924, when Congress enacted the White Act. Act of June 6, 1924, ch. 272, 43 Stat. 464. That Act delegated to the Secretary of the Interior the authority to prescribe a wide scope of fishery regulations for the waters of Alaska. The White Act did not substantially change the description of Cook Inlet. Cook Inlet was still defined as the area located landward of the Cape Douglas-Point Gore line, including the Barren Islands. Dept. of Commerce, Laws and Regulations for Protection of Fisheries of Alaska, p. 19 (Dec. 2, 1924). As was the case under the Alien Fishing Act, the testimony of witnesses who enforced the White Act indicated that lower Cook Inlet was regularly patrolled, and that numerous acts of enforcement of fishing regulations occurred in the same area over the years.

As a consequence of the enactment of the Alaska Statehood Act, both the Alien Fishing Act and the White Act were superseded. The result was that on January 1, 1960, the State of Alaska assumed control of the fisheries formerly within the jurisdiction of the federal Acts. The evidence indicates that the description of Cook Inlet under the Alaska Commercial Fishing Regulations since statehood has not substantially changed from the definition under the federal Acts. Under the Alaska regulations, Cook Inlet is comprised of the waters located inland from the line drawn from Cape Douglas to Point Gore, including the Barren Islands. 5 AAC 109.02 (1959).

The clearest exercise of sovereignty occurred in the Shelikof Strait in 1962. The Japanese fishing vessel *Banshu Maru* and others had apparently intruded into the southernmost portion of lower Cook Inlet near the Barren Islands for a few hours and then proceeded into the Shelikof Strait. On a prior occasion an official of the State Department indicated to the Governor of Alaska the federal government's unwillingness to act, but encouraged action by the State of Alaska. Consequently the State of Alaska effected the seizure and arrest of the *Banshu Maru* in Shelikof Strait. Although the evidence is conflicting, there is no clear evidence that the correctness of the act was officially denied or admitted by the United States.

■ The second requirement for establishing historic title to disputed waters is the continuity of the exercise of authority over a period of time sufficient to create a usage. Juridical Regime 101. No precise length of time is necessary to create a usage on which historic title is based. *Id.* 104. Since there are no precise time-limit criteria, the lapse of time necessary to permit emergence of historic title is a matter of sound judgment. *Id.* 123, 131.

The evidence produced by the State of Alaska proves clear beyond doubt that the exercise of authority over lower Cook Inlet has existed without interruption from 1906, and very possibly earlier, until the time this dispute arose. The legislative enactments have been applied consistently and without interruption for a sufficient time to give rise to a usage over the disputed waters.

The final requirement for establishing historic title is the attitude of foreign nations. The commentators of interna-

tional law do not agree on the precise attitude required. Most appear to require that the exercise of authority by the coastal nation be conducted under the general toleration of the community of nations, although others indicate that acquiescence is the required attitude. Juridical Regime 132. The Supreme Court has used language which indicates that acquiescence is the required standard, United States v. California, 381 U. S., at 172, 85 S.Ct. 1401, but there is no clearly binding authority on the point. Since under the facts of this case the requirement has been satisfied even under the higher standard of acquiescence, the distinction between toleration and acquiescence becomes a matter of academic significance.

Under the particular facts and evidence of this case, the Court finds it to be clear beyond doubt that the community of nations has acquiesced in the emergence of historic title of lower Cook Inlet. The testimony of witnesses who have been charged with enforcement of the fishery regulations over lower Cook Inlet has clearly indicated the general absence of foreign fishing vessels over the years. It should be noted that after the *Banshu Maru* incident, the Japanese and the State of Alaska agreed that in the future there would be no attempt by the Japanese to fish the waters in question. To date the agreement has been carefully respected by the Japanese. Although, since the *Banshu Maru* incident, there have been intrusions into other Alaskan waters by Japanese, Soviet, Korean and Canadian vessels, there have been no such documented intrusions into lower Cook Inlet.

Conflicting evidence exists as to a few isolated instances of earlier intrusions into Cook Inlet by Canadian halibut fishing vessels. Considering the entire record, it is probable that historic title to the disputed waters ripened before the date of those Canadian intrusions. Consequently, the presence of those vessels is neither relevant nor controlling on the issue of creation of historic title. Even if historic title had not ripened before the Canadian intrusions, it is not likely those intrusions would have interfered with the emergence of historic title for the reason that American authorities consented to their presence. Had the Canadians been present in greater numbers on more frequent occasions, or had they been fishing for salmon instead of halibut, it is probable that American fishing regulations would have been enforced against them. Further, the evidence indicates a spirit of comity existing in the form of customary reciprocal fishing rights between American and Canadian halibut fishermen which remained unwritten until 1970. Canada-U.S.A. Reciprocal Fishing Agreement, April 24, 1970.

In summary, the evidence indicates clear beyond doubt that foreign maritime nations having a possible interest in lower Cook Inlet have respected American dominion over those waters.

The requirements for the emergence of historic title have been satisfied under the general principles of international law. All of Cook Inlet located north of the Cape Douglas-Point Gore line, including the Barren Islands, are inland waters of the State of Alaska. Accordingly, under the provisions of the Submerged Lands Act of 1953, the subsurface resources of lower Cook Inlet are vested exclusively in the State of Alaska.

The United States has advanced the argument that a decision by this Court upholding historic title substantially would interfere with the conduct of foreign relations by the Executive branch of government. Under the facts and circumstances of this case, the Court sees no merit in that contention. The United States has never considered lower Cook Inlet to be a part of the high seas. As the evidence clearly establishes, the United States has long considered all of Cook Inlet to be historic inland waters.