**UNITED STATES of America, Plaintiff-Appellant,**

v.

**STATE OF ALASKA, Defendant-Appellee.**

**No. 73–2400.**

United States Court of Appeals, Ninth Circuit.

March 19, 1974.

Edward F. Bradley, Jr. (argued), Wallace H. Johnson, Asst. Atty. Gen., Bruce C. Rashkow, Dept. Justice, Washington, D. C., G. Kent Edward, U. S. Atty., Anchorage, Alaska, for plaintiff-appellant.

Thomas M. Phillips (argued), Houston, Tex., Charles K. Cranston (argued),

and John E. Havelock, Atty. Gen., State of Alaska, Anchorage, Alaska, for defendant-appellee.

Before KOELSCH, CARTER and WALLACE, Circuit Judges.

## OPINION

PER CURIAM:

The United States sued the State of Alaska to quiet title to the lower part of Cook Inlet located on the Alaska coast and to enjoin Alaska from offering oil and gas leases for sale in the area. The district court found in favor of Alaska. United States v. Alaska, 352 F.Supp. 815 (D.Alaska 1972). The United States appealed and we affirm.

In early 1967, Alaska offered to sell, at competitive bidding, an oil and gas lease to a tract of 2,500 acres of submerged lands located in lower Cook Inlet. The United States does not contest Alaska's right to the upper part of Cook Inlet. The tract in question, however, is located more than 3 geographic miles seaward of the low-water line, the closing lines of rivers and small bays within Cook Inlet and the 24-mile fallback line drawn across the narrows at Kalgin Island. The essence of the controversy involves the proper location of the Alaska coastline. The United States would place the coastline at the 24-mile fallback line at Kalgin Island. Alaska would place it at the 47-mile opening of Cook Inlet extending from Cape Douglas through the Barren Islands to Point Gore. The significance of the placement of this line is that under the Submerged Lands Act of 1953 (43 U.S.C. §§ 1301–1343), a state is entitled to the natural resources of the seabed and subsoil in waters up to 3 geographic miles seaward from the state's coast line at low tide or its functional equivalent as drawn by connecting the land openings of water inlets such as rivers and small bays. The waters landward from the line forming the functional equivalent of the coast line are inland waters belonging to the state and the 3-mile distance extends seaward from that line. Whether this line should be drawn at Kalgin Island (as the United States contends) or at Cape Douglas-Point Gore (as Alaska contends) will determine whether the area in question may be leased by Alaska. The pivotal question in this determination is whether this is a seabed over which there are "inland waters" as denominated in, but not defined by, the Submerged Lands Act. If so, Alaska is correct and the district court's judgment must be affirmed.

■ The Supreme Court has adopted the definition of inland waters as contained in the Convention on the Territorial Sea and the Contiguous Zone (T. I.A.S. No. 5639). United States v. California, 381 U.S. 139, 165, 85 S.Ct. 1401, 14 L.Ed.2d 296 (1965). Article 7 describes inland bays; but Cook Inlet fails to meet the definition which requires a distance of no more than 24 miles between the natural entrance points of the bay. Cook Inlet is 47 miles wide at its natural entrance points. Nevertheless, the Court has recognized that whether or not a body of water is inland may depend upon historical as well as geographical factors. The Court has stated:

> Certain shoreline configurations have been deemed to confine bodies of water, such as bays, which are necessarily inland. But it has also been recognized that other areas of water closely connected to the shore, although they do not meet any precise geographical test, may have achieved the status of inland waters by the manner in which they have been treated by the coastal nation.

United States v. Louisiana (Louisiana Boundary Case), 394 U.S. 11, 23, 89 S. Ct. 773, 781, 22 L.Ed.2d 44 (1969). Historic bays, which Article 7 exempts from the requirement of being no more than 24 miles between the natural entrance points, fall within this classification. As to such waters the Court in the *Louisiana Boundary Case* continued: "[I]t is generally agreed that historic title can be claimed only when the

'coastal nation has traditionally asserted and maintained dominion with the acquiescence of foreign nations.'" 394 U. S. at 23, 89 S.Ct. at 781, *quoting from* United States v. California, 381 U.S. 139, 172, 85 S.Ct. 1401, 14 L.Ed.2d 296 (1965). As further guidance the Court noted with apparent approval:

A recent United Nations study recommended by the International Law Commission reached the following conclusions:

"There seems to be fairly general agreement that at least three factors have to be taken into consideration in determining whether a State has acquired a historic title to a maritime area. These factors are: (1) the exercise of authority over the area by the State claiming the historic right; (2) the continuity of this exercise of authority; (3) the attitude of foreign States. First, the State must exercise authority over the area in question in order to acquire a historic title to it. Secondly, such exercise of authority must have continued for a considerable time; indeed it must have developed into a usage. More controversial is the third factor, the position which the foreign States may have taken towards this exercise of authority. Some writers assert that the acquiescence of other States is required for the emergence of an historic title; others think that absence of opposition by these States is sufficient." Juridical Regime of Historic Waters, Including Historic Bays, [1962] 2 Y.B.Int'l L. Comm'n 1, 13, U.N.Doc.A/CN. 4/143 (1962).

394 U.S. at 23–24 n.27, 89 S.Ct. at 781. The district court correctly adopted and applied this three-pronged test. Since the district court correctly applied the law, our sole remaining task is to determine whether the facts found by the trial court were clearly erroneous. United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

█ The United States mounts a heavy attack, reviewing in detail evidence which it contends leads unquestionably to the conclusion that the waters involved are at the most territorial rather than inland. It has succeeded in demonstrating that the evidence was in conflict and that the question of determining the ultimate inferences to be drawn was close. But it failed to show the findings to be clearly erroneous. The trial judge received the testimony of hundreds of witnesses and examined volumes of documents. The clearly erroneous test applies to both. W. S. Shamban and Co. v. Commerce and Industry Ins. Co., 475 F.2d 34 (9th Cir. 1973); United States v. Ironworkers Local 86, 443 F.2d 544, 548–49 (9th Cir.), cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L. Ed.2d 367 (1971); Lundgren v. Freeman, 307 F.2d 104, 114–15 (9th Cir. 1962).

As the Court in the *Louisiana Boundary Case* has instructed, boundary disputes involving such complex and detailed evidence as has been presented in this case must be resolved by answering questions that are primarily factual. This task can best be done by the trier of fact who has heard the evidence in the first instance. The Court stated:

Historic bays are not defined in the Convention, and the term therefore derives its content from general principles of international law. As the absence of a definition indicates, there is no universal accord on the exact meaning of historic waters. There is substantial agreement, however, on the outlines of the doctrine and on the type of showing which a coastal nation must make in order to establish a claim to historic inland waters. But because the concept of historic waters is still relatively imprecise and *its application to particular areas raises primarily factual questions*, we leave to the Special Master—as we did in United States v. California—the task of determining in the first instance

whether any of the waters off the Louisiana coast are historic bays.

394 U.S. at 75, 89 S.Ct. at 808 (emphasis added and footnotes omitted).

As the law applied by the district court was correct and its findings were not clearly erroneous, we affirm.

Affirmed.