# UNITED STATES *v.* ALASKA

No. 73–1888.   Argued April 16, 1975—Decided June 23, 1975

*Deputy Solicitor General Randolph* argued the cause for the United States. With him on the brief were *Solicitor General Bork, Assistant Attorney General Johnson, Gerald P. Norton, Bruce C. Rashkow,* and *Edward F. Bradley.*

*Charles K. Cranston* and *Thomas M. Phillips* argued the cause and filed a brief for respondent.

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

The issue here is whether the body of water known as Cook Inlet is a historic bay.[1] The inlet extends northeastward well over 150 miles into the Alaskan land mass, with Kenai Peninsula to the southeast and the Chigmit Mountains to the northwest. The city of Anchorage is near the head of the inlet. The upper, or inner por-

---

[1] Cook Inlet is larger than Great Salt Lake and Lake Ontario. It is about the same size as Lake Erie. It dwarfs Chesapeake Bay, Delaware Bay, and Long Island Sound, all of which the United States has claimed as historic bays.

tion, of the inlet is not in dispute, for that part is conceded to be inland waters subject to Alaska's sovereignty.

If the inlet is a historic bay, the State of Alaska possesses sovereignty over the land beneath the waters of the lower, or seaward, portion of the inlet. If the inlet is not a historic bay, the United States, as against the State, has paramount rights to the subsurface lands in question.

I

In early 1967 the State of Alaska offered 2,500 acres of submerged lands in lower Cook Inlet for a competitive oil and gas lease sale. The tract in question is more than three geographical miles from the shore of the inlet and is seaward more than three miles from a line across the inlet at Kalgin Island, where the headlands are about 24 miles apart, as contrasted with 47 miles at the natural entrance at Cape Douglas. In the view of the United States, the Kalgin Island line marks the limit of the portion of the inlet that qualifies as inland waters. The United States, contending that the lower inlet constitutes high seas, brought suit in the United States District Court for the District of Alaska to quiet title and for injunctive relief against the State.[2] Alaska defended on the ground that the inlet, in its entirety, was within the accepted definition of a "historic bay" and thus constituted inland waters properly subject to state sovereignty. Alaska prevailed in the District Court. 352 F. Supp. 815 (1972). The United States Court of Appeals for the Ninth Circuit affirmed with a *per curiam* opinion. 497 F. 2d 1155 (1974). We granted certiorari

---

[2] It would appear that the case qualifies, under Art. III, § 2, cl. 2, of the Constitution, for our original jurisdiction. *United States* v. *West Virginia,* 295 U. S. 463, 470 (1935). We are not enlightened as to why the United States chose not to bring an original action in this Court.

because of the importance of the litigation and because the case presented a substantial question concerning the proof necessary to establish a body of water as a historic bay. 419 U. S. 1045 (1974).

## II

State sovereignty over submerged lands rests on the Submerged Lands Act of 1953, 67 Stat. 29, 43 U. S. C. §§ 1301–1315.[3] By this Act, Congress effectively confirmed to the States the ownership of submerged lands within three miles of their coastlines.[4] See *United States* v. *Maine,* 420 U. S. 515 (1975). "Coast line" was defined in terms not only of land but, as well, of "the seaward

---

[3] Section 6 (m) of the Alaska Statehood Act of July 7, 1958, provides that the Submerged Lands Act "shall be applicable to the State of Alaska and the said State shall have the same rights as do existing States thereunder." 72 Stat. 343, note following 48 U. S. C. c. 2. Section 2 of the Act provides: "The State of Alaska shall consist of all the territory, together with the territorial waters appurtenant thereto, now included in the Territory of Alaska." 72 Stat. 339, note following 48 U. S. C. c. 2.

[4] Section 3 (a) of the Submerged Lands Act, 43 U. S. C. § 1311 (a), provides:

"It is determined and declared to be in the public interest that (1) title to and ownership of the lands beneath navigable waters within the boundaries of the respective States, and the natural resources within such lands and waters, and (2) the right and power to manage, administer, lease, develop, and use the said lands and natural resources all in accordance with applicable State law be, and they are, subject to the provisions hereof, recognized, confirmed, established, and vested in and assigned to the respective States . . . ."

Section 2 (b), 43 U. S. C. § 1301 (b), defines a State's boundaries:

"The term 'boundaries' includes the seaward boundaries of a State . . . as they existed at the time such State became a member of the Union . . . but in no event shall the term 'boundaries' or the term 'lands beneath navigable waters' be interpreted as extending from the coast line more than three geographical miles into the Atlantic Ocean or the Pacific Ocean . . . ."

limit of inland waters." [5] The term "inland waters" was left undefined.

In *United States* v. *California*, 381 U. S. 139, 161–167 (1965), the Court concluded that the definitions provided in the Convention on the Territorial Sea and the Contiguous Zone, [1964] 2 U. S. T. 1606, T. I. A. S. No. 5639, should be adopted for purposes of the Submerged Lands Act. See also *United States* v. *Louisiana* (*Louisiana Boundary Case*), 394 U. S. 11, 35 (1969). Under Art. 7 of the Convention,[6] and particularly ¶¶ 5

---

[5] Section 2 (c) of the Act, 43 U. S. C. § 1301 (c), reads:

"The term 'coast line' means the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters."

[6] The full text of Art. 7 is as follows:

"1. This article relates only to bays the coasts of which belong to a single State.

"2. For the purposes of these articles, a bay is a well-marked indentation whose penetration is in such proportion to the width of its mouth as to contain landlocked waters and constitute more than a mere curvature of the coast. An indentation shall not, however, be regarded as a bay unless its area is as large as, or larger than, that of the semi-circle whose diameter is a line drawn across the mouth of that indentation.

"3. For the purpose of measurement, the area of an indentation is that lying between the low-water mark around the shore of the indentation and a line joining the low-water marks of its natural entrance points. Where, because of the presence of islands, an indentation has more than one mouth, the semi-circle shall be drawn on a line as long as the sum total of the lengths of the lines across the different mouths. Islands within an indentation shall be included as if they were part of the water areas of the indentation.

"4. If the distance between the low-water marks of the natural entrance points of a bay does not exceed twenty-four miles, a closing line may be drawn between these two low-water marks, and the waters enclosed thereby shall be considered as internal waters.

"5. Where the distance between the low-water marks of the natural entrance points of a bay exceeds twenty-four miles, a straight baseline of twenty-four miles shall be drawn within the bay in such

and 6 thereof, a bay with natural entrance points separated by more than 24 miles is considered as inland water only if it is a "historic" bay. Since the distance between the natural entrance points to Cook Inlet is greatly in excess of 24 miles, the parties agree that Alaska must demonstrate that the inlet is a historic bay in order successfully to claim sovereignty over its lower waters and the land beneath those waters.[7]

The term "historic bay" is not defined in the Convention. The Court, however, has stated that in order to establish that a body of water is a historic bay, a coastal nation must have "traditionally asserted and maintained dominion with the acquiescence of foreign nations." *United States* v. *California,* 381 U. S., at 172. Furthermore, the Court appears to have accepted the general view that at least three factors are significant in the determination of historic bay status: (1) the claiming nation must have exercised authority over the area; (2) that exercise must have been continuous; and (3) foreign states must have acquiesced in the exercise of authority. *Louisiana Boundary Case,* 394 U. S., at 75 and 23–24, n. 27.[8] These were the general guidelines for the District Court and for the Court of Appeals in the present case.

## III

The District Court divided its findings on the exercise

---

a manner as to enclose the maximum area of water that is possible with a line of that length.

"6. The foregoing provisions shall not apply to so-called 'historic' bays, or in any case where the straight baseline system provided for in article 4 is applied."

[7] Brief for Respondent 1; Brief for United States 2, 32.

[8] Some disagreement exists as to whether there must be formal acquiescence on the part of foreign states, or whether the mere absence of opposition is sufficient. *United States* v. *Louisiana* (*Louisiana Boundary Case*) 394 U. S. 11, 23–24, n. 27 (1969).

of authority over lower Cook Inlet into three time periods, namely, that of Russian sovereignty, that of United States sovereignty, and that of Alaskan statehood. We discuss these in turn.

A

The evidence that Russia exercised authority over lower Cook Inlet as inland waters is understandably sparse. The District Court, nonetheless, concluded that "Russia exercised sovereignty over the disputed area of Cook Inlet." [9] The court based this conclusion on three findings. First, by the early 1800's there were four Russian settlements on the shores of Cook Inlet. Second, about 1786, an attempt by an English vessel to enter the inlet drew a volley of cannon fire from a Russian fur trader in the vicinity of Port Graham. Third, in 1821, Tsar Alexander I issued a ukase that purported to exclude all foreign vessels from the waters within 100 miles of the Alaska coast. S. Exec. Doc. No. 106, 50th Cong., 2d Sess., 204–205 (1889).

We feel that none of these facts, as found by the District Court, demonstrate the exercise of authority essential to the establishment of a historic bay. The presence of early Russian settlements on the shores of Cook Inlet certainly demonstrates the existence of a claim to the land, but it gives little indication of the authority Russia may have exerted over the vast expanse of waters that constitutes the inlet. The incident of

---

[9] Pet. for Cert. 25a. In addition to its reported opinion, 352 F. Supp. 815 (Alaska 1972), the District Court made detailed written findings and conclusions that are not published. These are reproduced in the Petition for Certiorari 21a–55a. The reported opinion of the District Court did not discuss the exercise of sovereignty prior to 1906, but the unreported findings indicate that the court relied on assertions of authority dating from Russian territorial times as well as the early American period.

the fur trader's firing on an English vessel near Port Graham might be some evidence of a claim of sovereignty over the waters involved, but the act appears to be that of a private citizen rather than of a government official.[10] In the absence of some evidence that the trader was acting with governmental authority, the incident is entitled to little legal significance. Moreover, under the then-common Cannon Shot Rule, the firing of cannon from shore was wholly consistent with the present position of the United States that the inland waters of Alaska near Port Graham are to be measured by the three-mile limit.[11] Finally, the imperial ukase of 1821 is clearly inadequate as a demonstration of Russian authority over the waters of Cook Inlet because shortly after it had been issued the ukase was unequivocally

---

[10] As with many colonial enterprises of the day, the governance of Alaska in the Russian period, for the most part, was exercised through semiprivate corporations. See generally H. Chevigny, Russian America: The Great Alaska Venture, 1741–1867 (1965). The most important of these corporations, the Russian-American Company, was chartered in 1799, several years after the incident near Port Graham. Id., at 75 The record and findings are silent on the relationship between the fur trader and the interests asserted. Thus, we have no occasion to consider whether the acts of a semiprivate colonial corporation are to be given the same weight as the direct acts of a national government for purposes of establishing a claim to historic waters.

[11] The Cannon Shot Rule was to the effect that a coastal state possessed sovereignty over the waters within range of cannon shot from its shore. Many modern scholars believe that the present 3-mile limit is derived from the traditional range of 18th century cannon. Kent, The Historical Origins of the Three-Mile Limit, 48 Am. J. Int'l L. 537 (1954); Walker, Territorial Waters: The Cannon Shot Rule, 22 Brit. Y. B. Int'l L. 210 (1945). The actual range of the cannon fired by the fur trader is, of course, now irrelevant. The significant fact is that the incident can be viewed as an assertion of jurisdiction only over those waters in Cook Inlet that were within range of cannon shot from shore.

withdrawn in the face of vigorous protests from the United States and England.[12]

## B

In reviewing the period of United States sovereignty over the Territory of Alaska,[13] the District Court found that there had been five separate instances in which the Federal Government had exercised authority over all the waters of Cook Inlet. Pet. for Cert. 26a–37a.

1. *Revised Statutes* § *1956 (1878)*. Soon after Alaska was ceded to the United States, Congress prohibited the killing of sea otter and other fur-bearing animals "within the limits of said territory, or in the waters thereof." Act of July 27, 1868, 15 Stat. 241, codified as Rev. Stat. § 1956 (1878). By itself, the statutory language does not indicate whether the waters of lower Cook Inlet were encompassed within the limits of Alaska "territory, or in the waters thereof." The District Court, however, found that in 1892 and 1893 five American vessels were boarded more than three miles from shore in the lower inlet by United States revenue officials investigating possible violations of § 1956.[14] From these boardings the

---

[12] For a discussion of the events surrounding the issuance and withdrawal of the ukase, see Chevigny, *supra*, n. 10, at 174–188.

[13] By the Treaty of Cession in 1867 Russia ceded to the United States "all the territory and dominion now possessed [by Russia] on the continent of America and in the adjacent islands." 15 Stat. 539. The cession was effectively a quitclaim. It is undisputed that the United States thereby acquired whatever dominion Russia had possessed immediately prior to cession.

[14] In June 1892 a United States revenue cutter, the *Mohican*, entered Cook Inlet to enforce Rev. Stat. § 1956. The *Mohican* arrested three American vessels in the lower inlet on charges of violating the statute. The prosecutions ultimately were dismissed on the ground that the vessels merely had been purchasing pelts from natives who were authorized by § 1956 to hunt sea otter for commercial sale. See *The Kodiak*, 53 F. 126 (Alaska 1892). In

District Court concluded that the statutory prohibition was enforced throughout Cook Inlet.

2. *The Alien Fishing Act of 1906.* This Act, 34 Stat. 263, prohibited noncitizens of the United States from fishing by commercial methods "in any of the waters of Alaska under the jurisdiction of the United States." Once again, the bare language of the statute fails to reveal the extent to which the prohibition applied to the waters of lower Cook Inlet. There is no evidence in the record and no findings by the District Court of any instance in which the Alien Fishing Act was enforced in the waters of Cook Inlet.[15]

3. *Executive Order No. 3752.* In 1922 President Harding issued an Executive Order creating the Southwestern Alaska Fisheries Reservation. Exec. Order No. 3752 (Nov. 3, 1922); 2 App. 676. The Order subjected all commercial fishing within the reservation to substantial regulation. See Regulations for the Administration of the Southwestern Alaska Fisheries Reservation, Department of Commerce Circular No. 251, pp. 8–9 (9th ed., Jan. 9, 1923); 2 App. 678–679. The reservation was described in the Order by a series of straight baselines to

----

1893 two other American vessels were stopped in the lower inlet by a revenue cutter. Since these vessels, like the *Kodiak,* were carrying only native hunting parties, they were allowed to proceed without further incident. The District Court made no findings about the enforcement of § 1956 after June 1893.

[15] The District Court acknowledged that no foreign vessels had ever been arrested in Cook Inlet on charges of violating the Alien Fishing Act. The court sought to explain this fact on the ground that foreign vessels entered the inlet infrequently. The court relied on statements of certain former wildlife officials that "they would have taken affirmative action" against foreign vessels if they had seen any in the inlet. 352 F. Supp., at 819–820. In the absence of any actual enforcement or official announcement of intentions to enforce the Alien Fishing Act in lower Cook Inlet, the private intentions of witnesses are largely irrelevant.

encompass a substantial expanse of waters, and the regulations promulgated pursuant to the Order by Secretary of Commerce Hoover referred to and embraced "all the shores and waters of Cook Inlet."

4. *The White Act.* In 1924 Congress passed "An Act For the protection of the fisheries of Alaska, and for other purposes," otherwise known as the White Act. C. 272, 43 Stat. 464. This authorized the Secretary of Commerce to "set apart and reserve fishing areas in any of the waters of Alaska over which the United States has jurisdiction." *Ibid.* The Act subjected commercial fishing within the reserved waters to such regulations as the Secretary might issue. From that time until Alaska statehood, the regulations of the Secretary defined the waters set aside pursuant to the Act to include all the waters of Cook Inlet. The District Court found that there had been several instances of enforcement of fishing regulations against American vessels more than three miles from shore in lower Cook Inlet.

5. *The Gharrett-Scudder line.* In 1957 representatives of Canada and of the United States met to discuss the possibility of prohibiting citizens of the two countries from fishing with nets for salmon in international waters in the North Pacific. The delegates generally agreed that the line used by the United States for enforcing fishing regulations under the White Act and related statutes would be used to delimit "offshore waters" for purposes of the joint salmon fishing limitations. Since the Canadian delegates felt that the description of the closing lines connecting headlands in the Alaska fishery regulations were not definitive, they requested a map showing the American line with greater precision. Two United States Bureau of Fisheries employees, John T. Gharrett and Henry Clay Scudder, prepared a chart of the Alaska coast with a line reflecting the boundaries in

the then-current United States fishery regulations. This so-called Gharrett-Scudder line enclosed all the waters of Cook Inlet. Charts reflecting the line were transmitted to the Canadian delegates. It is undisputed that the exact location of the Gharrett-Scudder line was determined primarily with reference to the needs of fishery management.[16] The maps were forwarded by the Bu-

---

[16] The testimony of John T. Gharrett, who was called as a witness by the State of Alaska, is indicative of the predominance of fish and wildlife concerns in the preparation of the Gharrett-Scudder line:

On direct examination:

"Q What was your role in the preparation of that line?

"A My role was to decide where the line goes.

"Q Did you have assistance from anyone?

"A Mr. Clay Scutter [sic].

"Q Has the line since been given any kind of name?

"A Oh, I don't know since. At the time we drew it, rather than to say 'a line beyond which we proposed,' et cetera, et cetera, we called it the Gharrett-Scutter [sic] line for short.

"Q In your preparation of the line what criteria did you use for placing the line on the chart?

"A We used two basic criteria: 1) we wanted to encompass within the line existing salmon net fisheries along the Coast of Alaska, and 2) we wanted in some areas to allow for a modest, perhaps, expansion of existing fisheries, salmon net fisheries." 1 App. 292–293.

On cross-examination by counsel for the United States:

"Q Did the lines you drew enclose areas in which you knew foreigners had previously fished?

"A Yes.

"Q By drawing these lines did you intend to stop those fisheries?

"A No.

"Q Was the line you drew with Mr. Scutter [sic] intended to represent the outer limit of the territorial sea?

"A No.

"Q Was the line you drew with Mr. Scutter [sic] intended to represent the base line from which the territorial sea was to be measured?

reau of Fisheries to the State Department for transmittal to the Canadian delegates with express disclaimers that the line was intended to bear any relationship to the territorial waters of the United States in a legal sense.

Based on the facts summarized above, the District Court concluded that the United States had exercised authority over the waters of lower Cook Inlet continuously from the Treaty of Cession in 1867 until Alaska statehood. The District Court, of course, was clearly correct insofar as it found that the United States had exercised jurisdiction over lower Cook Inlet during the territorial period *for the purpose of fish and wildlife management.* It is far from clear, however, that the District Court was correct in concluding that the fact of enforcement of fish and wildlife regulations was legally sufficient to demonstrate the type of authority that must be exercised to establish title to a historic bay.

In determining whether the enforcement of fish and wildlife management regulations in Cook Inlet was an exercise of authority sufficient to establish title to that body of water as a historic bay, it is necessary to recall the threefold division of the sea recognized in international law. As the Court stated in the *Louisiana Boundary Case:*

> "Under generally accepted principles of international law, the navigable sea is divided into three zones, distinguished by the nature of the control which the contiguous nation can exercise over them. Nearest to the nation's shores are its inland, or internal waters. These are subject to the complete sovereignty of the nation, as much as if they were

"A No.

"Q Were the lines you drew with Mr. Scutter [*sic*] used for law enforcement purposes while you were in Alaska?

"A No." 1 App. 294.

a part of its land territory, and the coastal nation has the privilege even to exclude foreign vessels altogether. Beyond the inland waters, and measured from their seaward edge, is a belt known as the marginal, or territorial, sea. Within it the coastal nation may exercise extensive control but cannot deny the right of innocent passage to foreign nations. Outside the territorial sea are the high seas, which are international waters not subject to the dominion of any single nation." 394 U. S., at 22–23 (footnotes omitted).

We also recognized in the *Louisiana Boundary Case* that the exercise of authority necessary to establish historic title must be commensurate in scope with the nature of the title claimed. There the State of Louisiana argued that the exercise of jurisdiction over certain coastal waters for purposes of regulating navigation had given rise to historic title over the waters in question as inland waters. Since the navigation rules in question had allowed the innocent passage of foreign vessels, a characteristic of territorial seas rather than of inland waters, the Court concluded that the exercise of authority was not sufficient in scope to establish historic title over the area as inland waters. *Id.*, at 24–26.

As has been noted, and as the parties agree, Alaska, in order to prevail in this case, must establish historic title to Cook Inlet as inland waters. For this showing, the exercise of sovereignty must have been, historically, an assertion of power to exclude all foreign vessels and navigation. The enforcement of fish and wildlife regulations, as found and relied upon by the District Court, was patently insufficient in scope to establish historic title to Cook Inlet as inland waters.

Only one of the fishing regulations relied upon by the court, the Alien Fishing Act, treated foreign vessels any

differently than it did American vessels. That Act, however, did not purport to apply beyond the three-mile limit in Cook Inlet. It simply applied to "the waters of Alaska under the jurisdiction of the United States." 34 Stat. 263. The meaning of that general statutory phrase, as applied to Cook Inlet, can only be surmised, since there was not a single instance of enforcement to suggest that the Act was applicable to foreign vessels in the waters beyond the three-mile limit in lower Cook Inlet. The remainder of the fish and wildlife regulations relied upon by the District Court clearly were enforced throughout lower Cook Inlet for at least much of the territorial period, but these regulations were not commensurate in scope with the claim of exclusive dominion essential to historic title over inland waters. Each afforded foreign vessels the same rights as were enjoyed by American ships. To be sure, there were instances of enforcement in the lower inlet, but in each case the vessels involved were American. These incidents prove very little, for the United States can and does enforce fish and wildlife regulations against its own nationals, even on the high seas. See, *e. g.*, 38 Stat. 692, 16 U. S. C. § 781 (taking commercial sponges in the Gulf of Mexico or the Straits of Florida); 80 Stat. 1091, 16 U. S. C. § 1151 (taking fur seals in the North Pacific Ocean); 86 Stat. 1032, as amended, 16 U. S. C. § 1372 (1970 ed., Supp. III) (taking marine mammals on the high seas). See also *Skiriotes* v. *Florida,* 313 U. S. 69 (1941).

Our conclusion that the fact of enforcement of game and fish regulations in Cook Inlet is inadequate, as a matter of law, to establish historic title to the inlet as inland waters is not based on mere technicality. The assertion of national jurisdiction over coastal waters for purposes of fisheries management frequently differs in geographic extent from the boundaries claimed as inland

or even territorial waters. See, *e. g.,* Presidential Proclamation No. 2668, 59 Stat. 885 (1945). This limited circumscription of the traditional freedom of fishing on the high seas is based, in part, on a recognition of the special interest that a coastal state has in the preservation of the living resources in the high seas adjacent to its territorial sea. Convention on Fishing and Conservation of the Living Resources of the High Seas, Art. 6, ¶ 1, [1966] 1 U. S. T. 138, 141, T. I. A. S. 5969.

Even a casual examination of the facts relied upon by the District Court in this case reveals that the geographic scope of the fish and wildlife enforcement efforts was determined primarily, if not exclusively, by the needs of effective management of the fish and game population involved. Thus, for example, the Gharrett-Scudder line, which the District Court considered "a classic demonstration of the assertion by the United States government of its claim to sovereignty over the whole of Cook Inlet," Pet. for Cert. 37a, was drawn almost solely with reference to the needs of the coastal salmon net fisheries and was never intended to depict the boundaries of the territorial waters of the United States. Indeed, the very method of drawing the fishery boundaries by use of straight baselines conflicted with this country's traditional policy of measuring its territorial waters by the sinuosity of the coast. See *United States* v. *California,* 381 U. S., at 167–169.

Even if we could agree that the boundaries selected for purposes of enforcing fish and wildlife regulations coincided with an intended assertion of territorial sovereignty over Cook Inlet as inland waters, we still would disagree with the District Court's conclusion that historic title was established in the territorial period. The court found that the third essential element of historic title, acquiescence by foreign nations, was satisfied by the fail-

ure of any foreign nation to protest. Scholarly comment is divided over whether the mere absence of opposition suffices to establish title. See Juridical Regime of Historic Waters, Including Historic Bays, 2 Yearbook of the International Law Commission, 1962, pp. 1, 16–19 (U. N. Doc. A/CN.4/143). The Court previously has noted this division but has taken no position in the debate. See *Louisiana Boundary Case,* 394 U. S., at 23–24, n. 27. In this case, we feel that something more than the mere failure to object must be shown. The failure of other countries to protest is meaningless unless it is shown that the governments of those countries knew or reasonably should have known of the authority being asserted. Many assertions of authority are such clear expressions of exclusive sovereignty that they cannot be mistaken by other governments. Other assertions of authority, however, may not be so clear. One scholar notes: "Thus, the placing of lights or beacons may sometimes appear to be an act of sovereignty, while in other circumstances it may have no such significance." Juridical Regime of Historic Waters, *supra,* at 14. We believe that the routine enforcement of domestic game and fish regulations in Cook Inlet in the territorial period failed to inform foreign governments of any claim of dominion. In the absence of any awareness on the part of foreign governments of a claimed territorial sovereignty over lower Cook Inlet, the failure of those governments to protest is inadequate proof of the acquiescence essential to historic title.

## C

The District Court stressed two facts as evidence that Alaska had exercised sovereignty over all the waters of Cook Inlet in the recent period of Alaska statehood. First, the court found that since statehood Alaska had enforced fishing regulations in basically the same fashion

as had the United States during the territorial period. Second, the court found that in 1962 Alaska had arrested two vessels of a Japanese fishing fleet in the Shelikof Strait. Since we have concluded that the general enforcement of fishing regulations by the United States in the territorial period was insufficient to demonstrate sovereignty over Cook Inlet as inland waters, we also must conclude that Alaska's following the same basic pattern of enforcement is insufficient to give rise to the historic title now claimed. The Shelikof Strait incident, however, deserves scrutiny because the seizure of a foreign vessel more than three miles from shore manifests an assertion of sovereignty to exclude foreign vessels altogether.

The facts of the incident, for the most part, are undisputed. In early 1962 a private commercial fishing enterprise in Japan, Eastern Pacific Fisheries Company, publicly announced its intention to send a fishing fleet into the waters of Cook Inlet and the Shelikof Strait. Alaska officials learned of the plan through newspaper accounts and requested action by the Federal Government to prevent entry of the fleet into the inlet and the strait. The Federal Government, although thus forewarned of the intrusion, significantly took no action. In March 1962, the mothership *Banshu Maru 31* and five other vessels arrived at the Kodiak fishing grounds. On April 5, the six vessels sailed north of the Barren Islands into the lower portion of Cook Inlet. The vessels left the inlet the next day without incident and sailed southwest into the Shelikof Strait. The vessels fished in the strait for approximately 10 days undisturbed. Then, on April 15, Alaska law enforcement officials boarded two of the vessels in the Shelikof Strait. At the time, at least one of the ships was more than three miles from shore. The officials arrested three of the fleet's captains and charged

them with violating the state fishing regulations applicable to the strait. On April 19, Eastern Pacific Fisheries Company and the State of Alaska entered into an agreement whereby the State released the company's employees and ships in return for a promise from the company that it would not fish in the inlet or in the strait pending judicial resolution of the State's jurisdiction to enforce fishing regulations therein. 2 App. 1186–1188. The Japanese Government did not participate in, or approve of, the agreement between the company and Alaska. Instead, shortly after the agreement was executed, Japan formally protested to the United States Government. Our Government declined to take an official position on the matter pending completion of the judicial proceedings. Ultimately, the judicial proceedings were dismissed without reaching any conclusion on the extent of Alaskan jurisdiction over the strait. The Federal Government took no formal position on the issue after the dismissal of the proceedings.

To the extent that the Shelikof Strait incident reveals a determination on the part of Alaska to exclude all foreign vessels, it must be viewed, to be sure, as an exercise of authority over the waters in question as inland waters. Nevertheless, for several reasons, we find the incident inadequate to establish historic title to Cook Inlet as inland waters. First, the incident was an exercise of sovereignty, if at all, only over the waters of Shelikof Strait. The vessels were boarded in the strait, some 75 miles southwest from the nearest portion of the inlet. Although Alaska officials knew of the fleet's earlier entry into Cook Inlet, no action was taken to force the vessels to leave the inlet, and no charges were filed for the intrusion into those waters. Second, even if the events in Shelikof Strait could constitute an assertion of authority over the waters of Cook Inlet as well

as those of the strait, we are not satisfied that the exercise of authority was sufficiently unambiguous to serve as the basis of historic title to inland waters. The adequacy of a claim to historic title, even in a dispute between a State and the United States, is measured primarily as an international, rather than a purely domestic, claim. See *United States* v. *California,* 381 U. S., at 168; *Louisiana Boundary Case,* 394 U. S., at 77. Viewed from the standpoint of the Japanese Government, the import of the incident in the strait is far from clear. Alaska clearly claimed the waters in question as inland waters, but the United States neither supported nor disclaimed the State's position. Given the ambiguity of the Federal Government's position, we cannot agree that the assertion of sovereignty possessed the clarity essential to a claim of historic title over inland waters. Finally, regardless of how one views the Shelikof Strait incident, it is impossible to conclude that the exercise of sovereignty was acquiesced in by the Japanese Government. Japan immediately protested the incident and has never acceded to the position taken by Alaska. Admittedly, the Eastern Pacific Fisheries Company formally and tentatively agreed to respect the jurisdiction claimed by Alaska but, as we have already noted, the acts of a private citizen cannot be considered representative of a government's position in the absence of some official license or other governmental authority.

In sum, we hold that the District Court's conclusion that Cook Inlet is a historic bay was based on an erroneous assessment of the legal significance of the facts it had found.[17] The judgment of the Court of Appeals,

---

[17] The United States has argued that historic title to Cook Inlet is defeated by several United States disclaimers of sovereignty over the waters of lower Cook Inlet. The Court previously has discussed the importance of governmental disclaimers in weighing claims to

accordingly, is reversed and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE DOUGLAS took no part in the consideration or decision of this case.

MR. JUSTICE STEWART and MR. JUSTICE REHNQUIST would affirm the judgment, believing that the findings of fact made by the District Court and adopted by the Court of Appeals were not clearly erroneous, and that both of those courts applied the correct legal criteria in ruling that Cook Inlet is a historic bay.

---

historic title in actions of this kind. *Louisiana Boundary Case,* 394 U. S., at 76–78; *United States* v. *California,* 381 U. S. 139, 175 (1965). The District Court rejected the disclaimers on the grounds that they were ill-advised and, perhaps, self-serving. 352 F. Supp., at 818–819. Inasmuch as we have concluded that none of the facts relied upon by the District Court suffice to establish historic title, we have no occasion to consider whether the disclaimers of the United States could have defeated otherwise sufficient facts.