**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES (AFL—CIO) et al., Plaintiffs,**

v.

**UNITED STATES et al., Defendants,**

and

**Chugach Management et al., Intervenor–Defendants.**

No. 00–0936(RMU).

United States District Court, District of Columbia.

March 29, 2002.

---

Anne Wagner, American Federation of Government Employees, AFL—CIO, Washington, DC, for Plaintiffs.

Daniel Van Horn, Ed Alkalay, Assistant United States Attorney, Washington, DC, Jodi Danis, Anat Ehrlich, Employment Litigation Section, Civil Rights Division, U.S. Department of Justice, Washington, DC, for Defendants.

Harvey A. Levin, Birch, Horton, Bittner & Cherot, P.C., Washington, DC, for Intervenor–defendants.

### MEMORANDUM OPINION

URBINA, District Judge.

DENYING THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; GRANTING THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; AND GRANTING THE INTERVENOR-DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I. INTRODUCTION

This Fifth Amendment due process case comes before the court on the parties' cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). In a two-count amended complaint, the American Federation of Government Employees, the American Federation of Government Employees, Local 2263 ("AFGE"), Rose Reed ("Reed"), and Inez Marquez ("Marquez") (collectively, "the plaintiffs") allege equal protection and substantive due process violations under the Fifth Amendment of the Constitution. The defendants are the United States and James G. Roche, in his official capacity as Secretary of the Air Force (collectively, "the defendants" or "the Air Force"). The intervenor-defendants are Chugach Management Joint Venture and Chugach Management Services, Inc. (collectively, "the intervenor-defendants" or "Chugach"), two corporations owned by Native Alaskans. The target of this lawsuit is Section 8014(3) of the Fiscal Year 2000 Defense Appropriations Act, Pub.L. No. 106–79, enacted October 25, 1999, 113 Stat. 1212, 1234 ("Section 8014(3)"). Section 8014(3) allows the Air Force to bypass the usual procedure for awarding a civil engineering contract and grant the contract to "a qualified firm under 51 percent Native American ownership." The plaintiffs ask this court to declare Section 8014(3) unconstitutional because it denies the plaintiffs an equal opportunity to compete for their jobs. After consideration of the parties' submissions and the relevant law, this court denies the plaintiffs' motion for summary judgment, grants the defendants' motion for summary judgment, and grants the intervenor-defendants' motion for summary judgment.

### II. BACKGROUND

#### A. Factual Background

On June 11, 2001, the plaintiffs filed an amended complaint alleging that the defendants violated the plaintiffs' equal protection and due process guarantees. *See* Am.Compl. ¶¶ 34, 36. These claims arose out of the Air Force's award of a civil engineering contract pursuant to Section 8014(3). *See id.* ¶ 28. Under the statute, the Air Force cannot contract out work performed by more than 10 federal civilian employees until a most efficient and cost-effective organization ("MEO") analysis is completed and certified to Congress. *See id.* ¶ 17. There are three enumerated exemptions to the required MEO analysis,

one of which forms the basis of the plaintiffs' claim herein. *See id.* ¶ 29. The exemption at issue abrogates the requirement of the MEO analysis when the Air Force converts an activity or function to performance by a qualified firm under "Native American ownership." *See* § 8014(3); Am.Compl. ¶ 27. Pursuant to the exemption, the Air Force awarded a contract to two such firms, the intervenor-defendants. *See* Am.Compl. ¶ 31.

Plaintiff Reed served as an electronic mechanic at Kirtland Air Force Base. *See id.* ¶ 6. Plaintiff Marquez was a material handler at Kirtland Air Force Base. *See id.* ¶ 10. Both of their positions were eliminated when the Air Force awarded the contract for the performance of civil engineering functions at Kirtland Air Force Base to Chugach. *See id.* ¶¶ 6, 10. Plaintiff AFGE is a labor organization whose members occupy positions that are affected by application of the Section 8014(3) exemption. *See id.* ¶ 3. Plaintiff AFGE Local 2263 is the exclusive representative of the civilian employees of the Air Force Material Command at Kirtland Air Force Base. *See id.* ¶ 4. Plaintiffs Reed and Marquez allege denial of an equal opportunity to compete for their jobs by virtue of the Air Force's use of the exemption at issue, Section 8014(3). *See id.* ¶¶ 7, 11, 28. Plaintiffs AFGE and AFGE Local 2263 represent the interests of their members whose constitutional rights have allegedly been and will continue to be violated by operation of Section 8014(3). *See id.* ¶ 3.

### B. Procedural History

On May 1, 2000, the plaintiffs filed the complaint and motion for a preliminary injunction. On the same day, Chugach filed a motion to intervene and this court granted that motion on May 3, 2000. *See* Order dated May 3, 2000. This court issued a Memorandum Opinion on June 30, 2000 and a supplemental order on July 5,

2000, denying the plaintiffs' motion for a preliminary injunction. *See AFGE v. United States,* 104 F.Supp.2d 58 (D.D.C. 2000); Order dated July 5, 2000. After seeking leave of this court to extend the defendants' time to answer the complaint, the defendants filed an answer on July 31, 2000. On August 7, 2001, all parties filed their respective motions for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). Those cross-motions for summary judgment are presently before the court. For the reasons that follow, the court denies the plaintiffs' motion for summary judgment, grants the defendants' motion for summary judgment, and grants the intervenor-defendants' motion for summary judgment.

### III. ANALYSIS

#### A. Legal Standards

##### 1. Legal Standard for a Motion for Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Diamond v. Atwood,* 43 F.3d 1538, 1540 (D.C.Cir.1995). To determine which facts are "material," a court must look to the substantive law on which each claim rests. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *See id.* at 252, 106 S.Ct. 2505. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. *See id.*

In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *See Greene v. Dalton,* 164 F.3d 671, 675 (D.C.Cir.1999); *Harding v. Gray,* 9 F.3d 150, 154 (D.C.Cir.1993). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *See Greene,* 164 F.3d at 675. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (internal citations omitted).

### 2. Legal Standard for Standing

Article III of the Constitution limits the jurisdiction of United States courts to "cases" or "controversies." *See* U.S. CONST. ART. III, § 2, cl. 1. Article III's prerequisites reflect the "common understanding of what it takes to make a justiciable case." *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 102, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). Consequently, in order for this court to have jurisdiction over a case, each plaintiff must have standing to bring their claim. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

### i. Individual Standing

■ An individual must satisfy a three-prong test to establish standing. *See id.* First, the individual must have suffered some injury in fact—an invasion of a legally protected interest that is concrete and particularized and actual or imminent. *See id.* at 560, 112 S.Ct. 2130; *MD Pharmaceutical Inc. v. Drug Enforcement Admin.,* 133 F.3d 8, 11 (D.C.Cir.1998) (concluding that current manufacturer had standing to seek review of actions taken by the DEA). In some cases, a plaintiff may be injured when the "discriminatory classification prevent[s] the plaintiff from competing on an equal footing." *Northeastern Fla. Chapter, Associated Gen. Contractors of America v. Jacksonville,* 508 U.S. 656, 667, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993) (holding that when the government erects a barrier, in order to establish standing, a group seeking to challenge the barrier need not allege they would have attained the benefit but for the barrier); *Regents of the University of California v. Bakke,* 438 U.S. 265, 281, 98 S.Ct. 2733, 57 L.Ed.2d 750 (holding that an applicant need not show that he would have attained the seat in admitted class in order to have standing).

In contrast, other courts have found that when seeking retrospective relief, the alleged injury is the "actual denial of the benefit rather than the inability to have competed for the benefit on an equal footing." *Saunders v. White,* 191 F.Supp.2d 95, 104–05 (D.D.C.2002) (*citing Yeager v. General Motors Corp.,* 265 F.3d 389, 395 (6th Cir.2001); *Comfort v. Lynn School Committee,* 150 F.Supp.2d 285, 299–301 (D.Mass.2001); *Sims v. Ware,* 1999 WL 637226 at *2 (N.D.Texas Aug, 20, 1999)).

Second, the injury must be fairly traceable to the governmental conduct alleged. *See Warth v. Seldin*, 422 U.S. 490, 504, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (finding lack of standing where city residents failed to show a causal relationship between town's zoning practices and alleged injury); *National Maritime Union v. Commander, Military Sealift Command*, 824 F.2d 1228 (D.C.Cir.1987) (holding that the plaintiff failed the second and third prongs of standing). A plaintiff will not have standing if this court must accept a speculative inference or assumption to link the alleged injury to the challenged action. *See id.; Andrx Pharm., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 815 (D.C.Cir. 2001) (declaring that the potential manufacturer's damages were not too speculative assuming it could claim its intent and preparedness to enter the market); *Advanced Mgmt. Tech. v. Federal Aviation Admin.*, 211 F.3d 633, 637 (D.C.Cir.2000) (holding that a contractor lacked standing on the theory of reputational injury).

Third, the plaintiff must prove that the alleged injury is likely to be redressed by a favorable decision of this court. *See Lujan*, 504 U.S. at 561, 112 S.Ct. 2130; *Tozzi v. U.S. Dep't of Health and Human Servs.*, 271 F.3d 301 (D.C.Cir.2001) (recognizing that upgrade classification change from "reasonably anticipated" to "known" carcinogen caused some economic injury that could be redressed by reversing the classification).

### ii. Organizational or Representational Standing

■ An organization has standing only if it meets a separate three-prong test. *See Truckers United for Safety v. Mead,*

251 F.3d 183 (D.C.Cir.2001) (holding that a motor carriers' association has standing to sue on behalf of its members for Department of Transportation's alleged abuses of agency authority). Such standing exists where the organization's members (1) would have standing to sue in their own right, (2) the interests that the organization seeks to protect are germane to its purposes, and finally, (3) neither the claims asserted nor the relief requested requires the participation of each of the organization's individual members. *See id.; Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000); *Hunt v. Washington State Apple Comm'n*, 432 U.S. 333, 342–43, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977) (agreeing with the district court's determination that a commission has standing to assert the claims of apple growers and dealers in its representational capacity); *Fund Democracy, LLC v. SEC*, 278 F.3d 21, 25 (D.C.Cir.2002) (applying test from *Laidlaw* and determining that no standing exists where a company has failed to show that individuals would have standing to sue in their own right).

### 3. Legal Standard for Equal Protection Claims

The Fourteenth Amendment's Equal Protection Clause prevents a state from enacting any law that deprives "any person within its jurisdiction the equal protection of the laws." *See* U.S. CONST. amend. XIV, § 1. Although the Fourteenth Amendment provides an explicit equal protection[1] directive to the states, the Supreme Court has held that the Fifth Amendment's Due Process Clause contains

---

1. The Supreme Court has held that there is no implied fundamental right to government employment for purposes of the Equal Protection Clause. *See United Building and Construction Trades Council v. Mayor of Camden*, 465 U.S. 208, 219, 104 S.Ct. 1020, 79 L.Ed.2d 249

(1984); *Massachusetts v. Murgia*, 427 U.S. 307, 313, 96 S.Ct. 2562, 49 L.Ed.2d 520. Notably, there is an intersection of implied fundamental rights and equal protection. *See United States v. Virginia*, 518 U.S. 515, 567, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996). The

an equal protection component applicable to the federal government. *See Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). The D.C. Circuit has held the same. *See Tucker v. Branker*, 142 F.3d 1294 (D.C.Cir.1998) (recognizing a federal government violation of the equal protection component of the Fifth Amendment's Due Process Clause). "Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment." *Buckley v. Valeo*, 424 U.S. 1, 93, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). There are three standards [2] of review which the Court has announced in the area of equal protection. These standards range in degree and dictate the depth of judicial scrutiny to be applied in equal protection claims. The key to evaluating a classification depends on the subject delineation, which, in turn, triggers the appropriate standard of review.

### i. Strict Scrutiny for Race and Nationality Classifications

■ The court analyzes classifications based on race under strict scrutiny and upholds such classifications only if they are narrowly tailored to serve a compelling governmental objective. *See Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *McLaughlin v. Florida*, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964). Likewise, classifications based on one's national origin are subject to the same exacting standard. *See Korematsu v. United States*, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944).

### ii. Heightened Scrutiny for Gender and Illegitimacy Classifications

■ The court does not permit delineations based on gender unless it is substantially related to an important governmental objective. *See Nguyen v. Immigration and Naturalization Serv.*, 533 U.S. 53, 121 S.Ct. 2053, 150 L.Ed.2d 115 (2001). The Supreme Court applies a quasi strict scrutiny analysis when it is faced with gender discrimination. *See United States v. Virginia*, 518 U.S. 515, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996).

question here pivots on the "fundamentality" of the interest and whether that interest is affected unequally. The equal protection prong and its appropriate level of scrutiny is triggered by the "suspectness" of the subject delineation. *See supra* Part III.A.3. For example, the Court has announced that there is a fundamental right, under equal protection jurisprudence, to procreate, vote, access the judicial process, and travel. *See Skinner v. Oklahoma*, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (holding that the right to vote and to gain access to the ballot is fundamental); *Douglas v. California*, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963) (recognizing a fundamental right to access the judicial process via criminal appeal); *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (stating that there is a fundamental right to travel).

**2.** The first two standards encompass groups possessing the traditional indicia of "suspect"

classes. Such indicia includes examination of whether the group is a discrete and insular minority and is without access to the political process ordinarily relied upon by minorities. *United States v. Carolene Products Co.*, 304 U.S. 144, 152–53, n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938). Suspect classifications are earmarked as such because they target minorities without access to the mechanism for change, are invidious, reinforces various stereotypes, and are an irrelevant basis upon which to draw a demarcation. *See San Antonio Independent Sch. Dist. v. Rodriguez*, 411 U.S. 1, 121, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). As such, the Court has not recognized "wealth" as a suspect classification. *See id.* Additionally "age" lacks the traditional indicia of a suspect class and therefore a classification based on age does not warrant a more heightened judicial scrutiny. *See Kimel v. Florida. Bd. of Regents*, 528 U.S. 62, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000).

As such, "[p]arties who seek to defend gender-based government action must demonstrate an 'exceedingly persuasive justification' for that action." *Id.* at 531, 116 S.Ct. 2264. Notwithstanding that fact, illegitimacy is still analyzed through the lens of traditional intermediate scrutiny analysis. *See Lalli v. Lalli,* 439 U.S. 259, 275, 99 S.Ct. 518, 58 L.Ed.2d 503 (1978).

### iii. Rational Basis for All Other Classifications

■ The rational basis standard of review is the most deferential and only inquires as to whether there is a rational or reasonable relationship to a legitimate governmental objective. *See Williamson v. Lee Optical,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955). If such a relationship exists, then the court will end its inquiry into the matter and declare the subject law constitutional. *See id.* In fact, a court may interject a hypothetical purpose or the parties may themselves proffer post-hoc rationales for the delineation. *See id.* at 487, 75 S.Ct. 461. Even though the subject classification is usually upheld under the rational basis standard of scrutiny, on occasion this test will result in the invalidation of a law or statute. *See Romer v. Evans,* 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996); *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). As such, the rational basis test has some teeth [3] because it leads to the abrogation of a law "whose relationship to an asserted goal is so attenuated as to render the

distinction arbitrary or irrational." *See Cleburne,* 473 U.S. at 446, 105 S.Ct. 3249; *Romer,* 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996), (striking down a State's constitutional amendment as unconstitutional, though employing rational basis review, because it was enacted based on animus against individuals that practice alternative lifestyles).

### 4. Legal Standard for Due Process Claims

■ The Fifth Amendment provides that no person shall be "deprived of life, liberty, or property, without due process of law." *See* U.S. CONST. amend. V. In order to have a life, liberty, or property interest, a person must have more than an abstract need or desire. *See Bd. of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Instead, a person is required to have a legitimate claim of entitlement. *See id.* These interests are not created by the Constitution but are defined by existing "rules or understandings that secure certain benefits and that support claims of entitlement." *Id.* Before an entitlement in property may be taken away, the entity must provide adequate procedure, such as a hearing, to protect the individual's reliance interest. *See id.* Property rights in governmental employment are subject to *procedural due process,* but no substantive due process attaches to those rights. *See id.* (emphasis added).

■ Substantive due process rights attach only when a fundamental right [4] is

---

**3.** When the Court employs rational basis review to strike down a classification, it is usually referred to as rational basis "with bite" or covertly heightened scrutiny. *See Access to Public Education,* 102 Harv.L.Rev. 201 (Harvard Law Review Association, Nov. 1988).

**4.** Fundamental rights are few. The history of substantive due process "counsels caution

and restraint" in deciding what constitutes a fundamental right. *See Moore v. East Cleveland,* 431 U.S. 494, 502, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977). The Court has rejected education and the receipt of public welfare as fundamental rights. *See San Antonio School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); *Dandridge v.*

involved, thus ensuring that those rights are not taken away merely through adequate procedural safeguards. *See Hutchins v. District of Columbia,* 188 F.3d 531, 535 (D.C.Cir.1999). The protection of fundamental rights is derived from the substantive component of the Fifth Amendment's Due Process Clause, which protects those rights that are "implicit in the concept of ordered liberty." *See Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 82 L.Ed. 288 (1937). Not all rights enumerated in the Bill of Rights are fundamental and warrant strict scrutiny analysis. *See Hutchins,* 188 F.3d at 538. When there is a classification that is protected by substantive due process, however, the appropriate judicial analysis is strict scrutiny. *See Washington v. Glucksberg,* 521 U.S. 702, 117 S.Ct. 2258, 521 U.S. 702 (1997). Such a classification will not survive unless it is found to be absolutely necessary or narrowly tailored to meet a compelling governmental interest. *See id.*

### B. The Plaintiffs Have Standing to Assert Their Claims

### 1. The Court Determines That the Individual Plaintiffs Have Standing to Assert Their Cause of Action

██ Plaintiffs Reed and Marquez have met their burden of establishing standing, thus allowing this court to proceed to the merits of this suit. The standing requirement is a prudential limitation placed on the judiciary, which ensures its constitutionally mandated jurisdiction. *See Lujan,* 504 U.S. at 560, 112 S.Ct. 2130. The individual plaintiffs satisfy the prudential limitation of standing.

██ Both plaintiffs Reed and Marquez allege injury because they assert a deprivation of the opportunity to compete to retain federal employment by operation of Section 8014(3). *See* Pls.' Mem. in Supp. of Mot. for Summ.J. at 19. Plaintiff Marquez further alleges economic harm. *See id.* at 21. They assert that those injuries are directly traceable to the Air Force's award of the contract pursuant to Section 8014(3). *See id.* at 26. Additionally, the plaintiffs' maintain that the court can declare Section 8014(3) unconstitutional and, thus, require the status-quo pre-conversion. *See id.* The court now examines these assertions against the required three elements of standing: injury, traceability, and redressibility.

Plaintiff Reed is currently employed at Vandenburg Air Force Base in California. The defendants argue that plaintiff Reed does not have standing because she is employed in the same position at Vandenberg Air Force Base and that the Air Force paid her moving expenses to California, thus falling short of the injury component. *See* Defs.' Mem. in Supp. of Mot. for Summ.J. at 6–7. The defendants also argue that plaintiff Marquez lacks standing because she accepted a $25,000.00 voluntary separation payment, retired early, and accepted a similar job with Chugach, thus failing to meet the injury component. *See id.* at 8. The defendants' challenge to the individual plaintiffs' standing pivots on the assertion that there was no injury suffered by those plaintiffs. *See id.* From the defendants' standpoint, plaintiff Reed voluntarily chose to move to Vandenberg Air Force Base and continue employment while plaintiff Marquez retired early and accepted a job with Chugach. *See id.* Moreover, the defendants contend there was no guarantee of a job since any offer of employment depended on surviving the Air Force's MEO analysis. *See id.*

*Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

There are two ways to frame the injury argument. The first is that the plaintiff was not able to compete for the benefit on an equal footing, thus personally being subjected to different treatment. *See Northeastern Florida Chapter of Associated Gen. Contractors of America v. Jacksonville*, 508 U.S. 656, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993); *Saunders v. White*, 2002 WL 338744 (D.D.C. March 4, 2002) (Lamberth, J.). The second is the actual denial of the benefit. *See Yeager v. General Motors Corp.*, 265 F.3d 389, 395 (6th Cir.2001); *Saunders*, at 110. If the second rationale is proffered, the plaintiff must allege that an illegal factor was predominant or substantially the motivating factor, and that such an illegal factor was used "because of"[5] the employer or its policy. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 241, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). The court determines that it need not determine which standard is appropriate because the court recognizes that plaintiffs Reed and Marquez have standing to challenge the Section 8014(3) preference under either standard.

The plaintiffs frame the loss of the right to compete as an injury distinct from the loss of their jobs. *See* Am.Compl. ¶ 7, 11. This is a valid distinction for the purposes of standing. In *Northeastern Florida Chapter of Associated General Contractors of America*, an association of contractors challenged an ordinance that "set aside" contracts for minorities and women. *See* 508 U.S. 656, 113 S.Ct. 2297, 124 L.Ed.2d

586. The Supreme Court held that the "injury in fact" in an equal protection case is the denial of equal treatment resulting from imposition of the barrier that precluded the contractors from consideration of all contracting awards. *See id.* at 666, 113 S.Ct. 2297. Thereafter, the Court ruled that a party challenging a set-aside program need only show that a discriminatory policy prevents the entity or person from competing on an equal basis and that the entity or person is "able and ready to bid on contracts." *See id.* This circuit employed similar reasoning in *Dynalantic Corp. v. Department of Defense*, 115 F.3d 1012 (D.C.Cir.1997). There, a defense contractor challenged the race-based set-asides in Section 8(a) of the Small Business Act, as amended 15 U.S.C. §§ 637 *et seq. See id.* The D.C. Circuit held that being deprived of an opportunity to compete for the set-aside contracts "clearly makes out an injury" for standing purposes. *See id.* at 1016.

Along this line of reasoning, there is a distinct and palpable injury alleged here because absent the operation of Section 8014(3), the Air Force would have conducted an MEO analysis, effectively comparing the "in-house" bid with that of the private contractor's bid, thereby not precluding the plaintiffs from the opportunity to compete. *See* Am.Compl. ¶ 29. In other words, the operation of the subject statute ultimately deprived the plaintiffs of the opportunity to compete whereby they otherwise could have been eligible to retain their employment at Kirtland Air Force

---

**5.** The Supreme Court recognizes an affirmative defense. *See Texas v. Lesage*, 528 U.S. 18, 120 S.Ct. 467, 145 L.Ed.2d 347 (1999). In *Lesage*, the Court stated that if the entity or government actor enacts a program using race as a predominant criterion, then it is an affirmative defense that the actor would not have acted any differently, absent the challenged criterion. *See id.* Several lower courts have been using the *Texas v. Lesage* standard and applying it to standing. *See Wooden v. Board of Regents of University System of Georgia*, 247 F.3d 1262, 1269 (11th Cir.2001); *Donahue v. City of Boston*, 183 F.Supp.2d 202, 208 (D.Mass.2001); *Boston's Children First v. Boston School Committee*, 183 F.Supp.2d 382, 393 (D.Mass.2002).

Base. *See* Am.Compl. ¶¶ 7, 11. As such, the operation of Section 8014(3) and subsequent preclusion of competing for the award of the civil engineering contract is directly traceable to the governmental conduct at issue, i.e., the Air Force's award of that civil engineering contract to Chugach. Thus, the plaintiffs meet the traceability prong of standing. *See Warth,* 422 U.S. at 504, 95 S.Ct. 2197; *National Maritime Union,* 824 F.2d at 1228. Turning to the next prong of standing, the individual plaintiffs sufficiently demonstrate that the alleged injury is likely to be redressed by a favorable decision of this court. *See Lujan,* 504 U.S. at 561, 112 S.Ct. 2130; *Tozzi,* 271 F.3d 301.

The plaintiffs ask the court to declare Section 8014(3) unconstitutional. Indeed, this court has the authority to enjoin defendants from using Section 8014(3), if deemed unconstitutional. Following this line of reasoning, the court may further direct restoration of the status quo prior to the direct conversion. *See id.* This would conceivably reinstate the civil engineering functions of the individual plaintiffs, not to mention all those individuals vicariously represented by plaintiffs AFGE. *See id.* In sum, the individual plaintiffs meet their burden of establishing all three elements of standing sufficient to invoke this court's jurisdiction, thus allowing these plaintiffs to proceed with their cause of action.

### 2. The Court Determines That Plaintiffs AFGE Have Representational Standing to Assert Their Claim

 Plaintiffs AFGE assert that they meet the organizational or representational standing requirements. Plaintiffs AFGE satisfy the first prong in that both individual plaintiffs Reed and Marquez have established standing to sue in their own right, as discussed previously. *See Friends of the Earth,* 528 U.S. at 181, 120 S.Ct. 693. Turning to the second and third requirements for organizational standing, the representational plaintiffs also argue that this suit raises a pure question of law, i.e., whether Section 8014(3) is an impermissible race-based preference in violation of the Fifth Amendment, which can be litigated without the participation of each of the organization's individual members. *See id.* at 29. The defendants contend AFGE does not have standing in a representational capacity by arguing that neither plaintiffs Reed nor Marquez have standing. *See* Defs.' Mem. in Supp. of Mot. for Summ.J. at 6. As the foregoing reflects, the court has already determined that plaintiffs Reed and Marquez do have standing to assert their claim.

The court agrees with plaintiffs AFGE's argument that they have standing to assert their claim on behalf of their members through their representational capacity. The court now evaluates the second and third prongs of representational standing against the given facts. The Supreme Court's test for representational standing, as stated in *Friends of the Earth,* was recently applied by the D.C. Circuit in *Fund Democracy, LLC v. Securities and Exchange Comm'n,* 278 F.3d 21 (D.C.Cir. 2002). In *Friends of the Earth,* an environmental group brought suit against a holder of a permit. *See Friends of the Earth,* 528 U.S. at 184, 120 S.Ct. 693. The permit allowed a threshold discharge of pollutants into surrounding water. *See id.* The group maintained that the holder of the permit violated the permit's discharge limits. *See id.* The Court determined that the individuals had standing to sue in their own right, so the only matter regarding standing was that of the organization. *See id.* Moving to the remaining prongs, the Court noted that the interest in protecting the water was germane to the organization's purpose, which was limiting

the discharge of pollutants into surrounding waters. *See id.* The Court further recognized that the protection of that interest did not require all members to join in the suit. *See id.*

Just as the Court looked to the central purpose of the organization in *Friends of the Earth,* this court also looks to the central purpose of AFGE. One of the central purposes of AFGE is the protection of its members from perceived constitutional violations. *See* Am.Compl. § 3. Indeed, the representational plaintiffs assert that protecting the constitutional rights of federal employees in their dealings with their employer is unquestionably central to the organizations' purpose since AFGE, among other things, negotiates collective bargaining agreements, arbitrates grievances, files unfair labor practices and litigates employees' constitutional and statutory rights in federal, state, and administrative fora on behalf of its members. *See* Pls.' Mem. in Supp. of Mot. for Summ.J. at 28. That function satisfies the second prong of the test, which is germaneness to the organization's purpose. *See Friends of the Earth,* 528 U.S. at 181, 120 S.Ct. 693; *Hunt,* 432 U.S. at 342–43, 97 S.Ct. 2434; *Fund Democracy,* 278 F.3d at 25. The third prong is also satisfied because, just like the plaintiff in *Friends of the Earth,* plaintiffs AFGE do not need each of their members to participate in this action to enjoin the use of Section 8014(3) nor for the court to adjudicate Section 8014(3)'s constitutionality. *See Friends of the Earth,* 528 U.S. at 184, 120 S.Ct. 693. Consequently, AFGE, in its representational capacity, satisfies Article III's prerequisites for a justiciable case. *See Citizens for a Better Env't,* 523 U.S. at 102, 118 S.Ct. 1003. Since the threshold question of standing has been resolved in favor of the plaintiffs, the court proceeds to adjudicate the merits of the plaintiffs' claims by applying the appropriate standard for summary judgment.

*Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (holding that the respondent failed to establish standing that would confer the court's jurisdiction).

## C. The Court Applies Rational Basis Scrutiny to Section 8014(3)

Count One of the amended complaint alleges a violation of the equal protection component of the Fifth Amendment's Due Process Clause. *See* Am.Compl. ¶ 33. Before applying the appropriate legal standard of review to the given facts, tracing the development of jurisprudence in this area provides some guidance in evaluating why the rational basis standard applies in this case and why Section 8014(3) is constitutionally sound. In a case of this variety, which does not specifically involve a state's action, a court must look to the Fifth Amendment's proscription. *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). Although the Fifth Amendment does not provide as explicit a guarantee of "equal protection" as does the Fourteenth Amendment, our Supreme Court has understood the Fifth Amendment's "due process" to afford protection against the same arbitrary treatment that can be instituted by the federal government. *See id.*

Early due process analysis involved legislation which discriminated based on factors other than race. The Supreme Court held that interests affected by those statutes were not subject to constitutional protection because "[u]nlike the Fourteenth Amendment, the Fifth [Amendment] contains no equal protection clause." *See Detroit Bank v. United States,* 317 U.S. 329, 337, 63 S.Ct. 297, 87 L.Ed. 304 (1943) (holding statute authorizing unrecorded tax lien and withholding lien against innocent purchasers, transferred *inter vivos,* could not violate equal protection because

the Fifth Amendment does not entail an equal protection guarantee); *LaBelle Iron Works v. United States,* 256 U.S. 377, 392, 41 S.Ct. 528, 65 L.Ed. 998 (1921) (holding that cases decided under the Fourteenth Amendment have no application to federal taxes).

In 1954, the Court settled once and for all the question of whether the Constitution imposes a lesser restriction on the states than on the federal government. In the context of desegregation of public schools, the Court concluded that since the Constitution prohibited the states from maintaining racially segregated schools, it would be "unthinkable that the same Constitution would impose a lesser duty on the Federal Government." *See Bolling,* 347 U.S. at 500, 74 S.Ct. 693. The Court echoed " 'that the Constitution of the United States, in its present form, forbids, so far as civil and political rights are concerned, discrimination by the General Government, or by the States, against any citizen because of his race.' " *Id.* at 499, 74 S.Ct. 693 (quoting *Gibson v. Mississippi,* 162 U.S. 565, 591, 16 S.Ct. 904, 40 L.Ed. 1075 (1896)). A majority of the Supreme Court has confirmed that "[t]he Court's application of that general principle to the case before it, and the resulting imposition on the federal government of an obligation equivalent to that of the States, followed as a matter of course." *See Adarand Const., Inc. v. Pena,* 515 U.S. 200, 216, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). Thus, cases interpreting equal protection under the Fourteenth Amendment apply to this area of equal protection under the Fifth Amendment.

The first step of the analysis begins with the determination of the appropriate standard of review. The parties are at polar opposite ends of the spectrum when they assert the level of review applicable to Section 8014(3). The plaintiffs contend that the classification should be subject to strict scrutiny because it is unconstitutionally race-based on its face. *See* Pls.' Mem. in Supp. of Mot. for Summ.J. at 29. This assertion suggests that Native American or Native Alaskan is solely an identified race and is only used in earmarking a race of persons. The defendants argue that rational basis applies herein since the subject classification is political in nature rather than based on race. *See* Defs.' Mem. in Supp. of Mot. for Summ.J. at 19. Intervenor-defendants Chugach also join the defendants' assertion that rational basis applies to the instant classification. *See* Int.-Defs.' Mem. in Supp. of Mot. for Summ.J. at 10. The court agrees with the position taken by the defendants and the intervenor-defendants and applies the rational basis standard of review to Section 8014(3).

The plaintiffs rather forcefully argue that the preference under Section 8014(3) is race-based and that the Supreme Court's line of cases under "benign" discrimination govern this issue. *See* Pls.' Mem. in Supp. of Mot. for Summ.J. at 32. *Cf. Adarand,* 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (asserting that all classifications based on race are subject to strict scrutiny review). The plaintiffs further argue that the classification fails because it is not the most narrowly tailored to serve a compelling governmental interest. *See* Pls.' Mem. in Supp. of Mot. for Summ.J. at 29–30. In addition, the plaintiffs allege that the exemption does not seek to redress past discrimination, which is recognized as a compelling interest under settled law. *See id.; Adarand,* 515 U.S. at 237, 115 S.Ct. 2097. In fact, they allege the statute is unconstitutional on its face because the legislative history[6] lacks rea-

---

6. The Court has stated that "canons [of statu- tory interpretation] are [guides] designed to

sons for Section 8014(3)'s enactment and, thus, "its benefits may even extend to non-Native American partners who own up to 49% of the contracting firm." Pls.' Mem. in Supp. of Mot. for Summ.J. at 31–33. The plaintiffs also explore the view that there is "no basis" to conclude Section 8014(3) is restricted to tribal entities. *See id.* at 34.

The defendants contend—and the court agrees—that the preference is subject to rational basis scrutiny because Section 8014(3) encompasses a political, rather than a race-based classification. The defendants cite a plethora of justifications. Among them are Congress's constitutionally derived power from the Indian Commerce and Treaty Clause of Article II and the legislative arm's unique authority to legislate on behalf of tribally affiliated Indians as a politically-defined group. *See* Defs.' Mem. in Supp. of Mot. for Summ.J. at 13. The Constitution provides Congress with the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian tribes." U.S. CONST. art. I, § 8, cl. 3. Thus, the Constitution itself, commits the power to regulate commerce with the Indian tribes to the legislative arm of the federal government. *See id.* Notably, the defendants also avow that the Section

8014(3) exemption, which facilitates contracting with Native American owned firms, furthers the federal policy of Indian self-determination, the United States's trust responsibility, and the promotion of economic self-sufficiency among Native American communities. *See* Defs.' Mem. in Supp. of Mot. for Summ.J. at 21.

Indeed, the court notes that Congress has established programs and benefits for the education of tribal members in an effort to ameliorate high rates of illiteracy among Native American populations. *See, e.g.,* Indian Self–Determination and Education Assistance Act, as amended 25 U.S.C. §§ 450–458; Tribally Controlled Community College Assistance Act, as amended 25 U.S.C. §§ 1801–1852. Congress has also enacted statutes to provide health services and to construct safe water-supply and water-disposal systems for Native American homes and communities. *See, e.g.,* Indian Health Care Improvement Act, as amended 25 U.S.C §§ 1601 *et seq.* Federally recognized tribes benefit from other special general assistance and child welfare programs as well, including the Food Stamp Program, as amended 7 U.S.C. §§ 2011–2036, and the Indian Child Welfare Act, as amended 25 U.S.C. §§ 1901–1963.

help judges determine the Legislature's intent as embodied in particular statutory language. And other circumstances evidencing congressional intent can overcome their force." *Chickasaw Nation v. United States,* 534 U.S. 84, 122 S.Ct. 528, 534, 151 L.Ed.2d 474 (2001). The court recognizes that evidence of congressional intent via its legislative history is not a requisite but may be a tool in some instances. Even later history may provide guidance of that intent. *See J.E.M. AG Supply, Inc. v. Pioneer Hi–Bred Intern., Inc.,* 534 U.S. 124, 122 S.Ct. 593, 608, 151 L.Ed.2d 508 (2001) (looking to later history of a second statute in order to glean legislative intent). This court also acknowledges that it must "construe a statute in a manner that requires

decision of serious constitutional questions only if the statutory language leaves no reasonable alternative." *United States v. Five Gambling Devices,* 346 U.S. 441, 448, 74 S.Ct. 190, 98 L.Ed. 179 (1953). Furthermore, this court notes that another canon of statutory construction embraces the notion that statutes should be construed to avoid a possible unconstitutional result. *See Waterview Mngmnt. Co. v. FDIC,* 105 F.3d 696, 701 (D.C.Cir. 1997); *Richmond Screw Anchor Co. v. United States,* 275 U.S. 331, 346, 48 S.Ct. 194, 72 L.Ed. 303 (1928); *United States v. Rumely,* 345 U.S. 41, 45, 73 S.Ct. 543, 97 L.Ed. 770 (1953). Since rational basis review applies to Section 8014(3), the statute passes constitutional muster.

Intervenor-defendants Chugach's argument virtually mirrors that of the Air Force. They ultimately conclude that Section 8014(3) is a reasonable way to fulfill the government's obligation as trustee and to assist in Native American self-determination. *See* Int.–Defs.' Mem. in Supp. of Mot. for Summ.J. at 38. Chugach's brief also fully develops and explores the lengthy historical perspective in which the enactment of Section 8014(3) is set, including the special duty to Native Americans. Chugach then argues that the Section 8014(3) preference needs to be understood in the context of the enactment, that is, a mechanism to promote the financial success of Native corporations in accordance with the Alaska Native Claims Settlement Act ("ANCSA"), the Treaty of Cession and Congress's special trust responsibility to Native Alaskans. *See id.* at 39. Admittedly, all of Title 25 of the United States Code is dedicated to Indian legislation. *See* 25 U.S.C.

Both the defendants and the intervenor-defendants claim that the *Morton v. Mancari,* 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974), line of precedent controls the outcome in this case rather than the *Adarand* line of precedent. *See* Defs.' Mem. in Supp. of Mot. for Summ.J. at 23; Int.–Defs.' Mem. in Supp. of Mot. for Summ.J. at 31. *Mancari* involved a constitutional challenge asserted by non-Native American federal employees against a federal statute that established a preference in favor of Native Americans in the filling of job vacancies in the Bureau of Indian Affairs. *See Mancari,* 417 U.S. at 539, 94 S.Ct. 2474. They alleged, among other things, that the challenged statute deprived them of property rights in violation of the Fifth Amendment's due process

component. *See id.* A three-judge district court ruled that the statute was impliedly repealed by the 1972 Equal Employment Opportunity Act, as amended 42 U.S.C. § 2000e–16(a). *See id.* at 540, 94 S.Ct. 2474. The Supreme Court reversed the lower court's ruling and held that Congress did not intend to repeal the Native American preference. *See id.* at 551, 554–55, 94 S.Ct. 2474.

The plaintiffs claim that even if *Mancari* is controlling here, it is limited by *Rice v. Cayetano,* 528 U.S. 495, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000) (declaring a law limiting the ability to vote as an unconstitutional bar in violation of the Fifteenth Amendment). The defendants argue, however, that the plaintiffs' attempt to limit *Mancari* is unconvincing because *Rice* does not apply to the instant case. The court agrees with the defendants. *Rice*[7] only dealt with the right to vote, which is a fundamental right evoking strict scrutiny review. *See Rice,* 528 U.S. at 498–99, 120 S.Ct. 1044. Moreover, *Rice* involved neither a Fifth Amendment due process claim nor a Fourteenth Amendment equal protection claim. *See id.*

The court also agrees with the defendants' and intervenor-defendants' argument that Section 8014(3) is not race-based. A reading of that statute lends great credence to the argument that the *Mancari* line is the governing law. *Adarand* dealt with 'race-based' classifications while *Mancari* dealt with a 'political' classification arising from a long history regarding Native Americans and our country's unique duty toward them. *Compare Adarand,* 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158, *with Mancari,* 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290. More importantly, *Mancari* specifically consid-

---

**7.** The court notes that the definition of "Native" as used in the ANCSA was cited as an example of a constitutionally valid tribal defi-

nition in the joint concurrence of Justices Breyer and Souter in *Rice. See Rice,* 528 U.S. at 525, 120 S.Ct. 1044.

ered Native Americans as a political classification. *See Mancari*, 417 U.S. at 548, 554, 94 S.Ct. 2474. (observing that "Indians [are] not ... a discrete racial group, but, rather, ... [are] members of quasi-sovereign tribal entities"). As such, the appropriate level of scrutiny applicable to Section 8014(3) is rational basis and the delineation must be rationally related to a legitimate governmental purpose. *See Mancari*, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290; *Narragansett Indian Tribe v. National Indian Gaming Comm'n*, 158 F.3d 1335, 1340 (D.C.Cir.1998) (applying rational basis scrutiny to a constitutional challenge of an amendment to the Rhode Island Claims Settlement Act). Here the government seeks to fulfill its unique trust obligations and promote self-determination and self-governance of Native–Americans. *See* Defs.' Mem. in Supp of Mot. for Summ.J. at 21.

Just last year the D.C. Circuit affirmed a case involving the United States's trust obligation. *See Cobell v. Norton*, 240 F.3d 1081 (D.C.Cir.2001). The D.C. Circuit recognized that our country's expansion resulted in relocation and removal of many tribes by means of treaty and force. *See id.* at 1088; *e.g., Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 8 L.Ed. 25 (1831) (holding that the history of the United States shows that the Cherokee Nation is a foreign state competent to maintain suit against Georgia). The D.C. Circuit then traced the government's changing policy after assimilation efforts failed. *See id.* These efforts ranged from unsuccessful attempts at terminating the trust relationship to the "current policy of 'self determination and self governance.'" *See id.* at 1088 (*quoting Cobell v. Babbitt*, 91 F.Supp.2d 1, 9 (D.D.C.1999) (declaring that the Secretary of the Treasury breached his fiduciary duties)); *Alaska Chapter, Associated Gen. Contractors of Am., Inc. v. Pierce*, 694 F.2d 1162 (9th Cir.1982)

(recognizing that the guardian-ward relationship arose because of the Indian tribes' subordination of sovereignty for protection of the government). In addition, and as stated before, the Supreme Court addressed an equal protection challenge to a statute that created an employment preference in the Bureau of Indian Affairs. *See Mancari*, 417 U.S. at 548, 94 S.Ct. 2474. As described earlier, the Court also looked to the history of the United States's relations with the Indian tribes and held that the employment preference did not constitute 'racial discrimination' and was not even a 'racial' preference. *See id.* at 553, 94 S.Ct. 2474. Since the preference applied only to members of federally recognized tribes, it was rationally related to the fulfillment of the United States's unique trust responsibility that is committed to the Congress by the Constitution. *See id.* at 555, 94 S.Ct. 2474.

**D. The Court Determines that Section 8014(3)'s Preference is Constitutional and Does Not Violate Equal Protection Because it is a Reasonable Mechanism Aimed at Fulfilling Congress's Special Obligations to Alaska Natives Who Have Been Afforded the Same Treatment as Native Americans for Constitutional and Legislative Purposes**

Section 8014 provides in relevant part, that no funds:

shall be available to convert to contractor performance an activity or function of the Department of Defense that ... is performed by more than 10 Department of Defense civilian employees until a most efficient and cost effective organization analysis is completed on such activity or function ... Provided, that this section and subsections (a), (b), and (c) of 10 U.S.C. 2461 shall not apply to a commercial or industrial type function of the Department of Defense that ... (3)

is planned to be converted to performance by a qualified firm under 51 per centum Native American ownership. See § 8014(3) of the Defense Appropriations Act for Fiscal Year 2000, P.L. 106–79, 113 Stat. 1212, 1234 (1999). To understand why this section is constitutional on its face and as applied, it is important to understand the history and the reasons behind the formation of firms such as those formed by the intervenor-defendants Chugach, to whom the contract was awarded.

■ Congress derives its authority to legislate under the Indian Commerce Clause regarding Alaska Natives from the Treaty of Cession with Russia.[8] See 15 Stat. 539. That authority reflects the historical existence of Alaska Natives as members of sovereign communities. See Native Village v. Alaska, 944 F.2d 548, 558 (9th Cir.1991) (applying United States v. Wheeler 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978)) (requiring Alaska to give full faith and credit to child custody determinations made by tribal courts of the native villages). Thus, Alaska Native groups are afforded the same treatment as Indian tribes for constitutional and legislative purposes. See Pierce, 694 F.2d at 1168 n. 10 (upholding Alaska Native preference and citing Alaska Pacific Fisheries v. United States, 248 U.S. 78, 39 S.Ct. 40, 63 L.Ed. 138 (1918) (holding that statutes passed for the benefit of Indian tribes or communities are to be liberally construed and doubtful expressions resolved in favor of the Indians)). This includes their self-determination and economic self-sufficiency. In Pierce, the Ninth Circuit also recognized that "Congress has utilized methods other than tribal rolls or proximity to reservations which have generally been used as eligibility criteria in statutory programs for the benefits of Indians." Pierce, 694 F.2d at 1168 n. 10.

■ Although "[t]reaties ... were originally the primary instrument for the expression of this relationship," in the modern era "[f]ederal laws like [S]ection 8014 are the means by which the United States carries out its trust responsibilities and the [f]ederal policy of self-determination and economic self-sufficiency." Amendment No. 3319, 146 Cong.Rec. S5019 (daily ed. June 13, 2000). The ANCSA[9] is one such mo-

---

**8.** In 1867 Russia ceded to the United States, "all the territory and dominion now possessed (by Russia) on the continent of America and in the adjacent islands." See 15 Stat. 539 (Mar. 30, 1867). Article III of the Treaty states:

> The inhabitants of the ceded territory, according to their choice, reserving their natural allegiance, may return to Russia within three years, but if they should prefer to remain in the ceded territory, they, with the exception of uncivilized native tribes, shall be admitted to the enjoyment of all the rights, advantages, and immunities of citizens of the United States.... The uncivilized tribes will be subject to such laws and regulations as the United States may, from time to time, adopt in regard to aboriginal tribes of that country.

15 Stat. 542. The cession was effectively a quitclaim. It is undisputed that the United States thereby acquired whatever dominion Russia had possessed immediately prior to cession. See United States v. Alaska, 422 U.S. 184, 192 n. 13, 95 S.Ct. 2240, 45 L.Ed.2d 109 (1975).

**9.** In 1971, Congress enacted the ANCSA to settle the aboriginal claims of Alaska Natives to the land and resources of the State of Alaska. See 43 U.S.C. § 1601 et seq. The ANCSA requires the Secretary of the Interior to divide Alaska into 12 regions and the Natives of each region are required to form for-profit corporations under Alaska law. See 43 U.S.C. § 1606(a), (d). Each Native Alaskan "enrolled" in a region receives 100 shares of the Regional Corporation. See id. Chugach Alaska Corporation, the parent of intervenor-defendants herein, is the Regional Corporation for south-central Alaska. See 43 U.S.C. § 1606(a)(9). Only Native Alaskans can sit on the board of an Alaska Native Corporation and, until 1991, shares were not alienable

dem mechanism that designates Native Alaskan Corporations as the vehicle used to provide continuing economic benefits in exchange for extinguished aboriginal land rights. *See Koniag, Inc. v. Koncor Forest Res.,* 39 F.3d 991, 997 (9th Cir.1994). Intervenor-defendants Chugach are two such firms formed under the auspices of the ANCSA. *See* Defs.' Mem. in Supp. of Mot. for Summ.J. at 31.

The court next examines the relationship between the ANCSA and Section 8014(3)'s application to Native Americans. On the face of Section 8014(3), there is no definition of exactly what is meant by "Native American." The subsequent legislative history, however, reflects a clarification by Congress for that term to take on the meaning of "ownership by an Indian tribe, as defined in 25 U.S.C. [§ ]450[b](e)." *See* Amendment No. 3319, 146 Cong.Rec. S4961 (daily ed. June 12, 2000); P.L. 106–259, 114 Stat. 656, 677 (2000). Therefore, Section 8014(3) only applies to those Indian tribes so designated by 25 U.S.C. § 450b(e) and includes "any Alaska ... village corporation as defined in or established pursuant to [the ANCSA]." *See* 25 U.S.C. § 450b(e). The court's ability to accept the subsequent definition turns on whether Section 8014(3) was enacted with the required Congres-

sional power.[10] *See United States v. Cohen,* 733 F.2d 128, 139 (1984). Once that predicate is shown, the rational basis standard applies. *See id.*

First, the Supreme Court has stated that subsequent legislation is entitled "great weight in statutory construction." *See Red Lion Broadcasting Co. v. Federal Communications Comm'n,* 395 U.S. 367, 380, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969) (holding that legislation declaring intent of earlier statute is entitled to great weight in statutory construction). Second, Congress acted within its power when it enacted the current statute under which the intervenor-defendants were formed. The ANCSA is a tool to help Alaska Natives attain their economic self-sufficiency, eventually allowing Congress the leeway to relinquish its trust obligation. *See Koniag,* 39 F.3d at 997. The ANCSA states that "[n]otwithstanding any other provision of law, Alaska Natives shall remain eligible for all Federal Indian programs on the same basis as other Native Americans." 43 U.S.C. § 1626(d). The Section 8014(3) preference operates to favor 51 percent Native American owned firms, which is a political classification subject to rational basis scrutiny. *See Mancari,* 417 U.S. at 554, 94 S.Ct. 2474.

---

except among Native Alaskans. *See* 43 U.S.C. § 1606(f). The purpose of this system is to foster self-determination and financial independence · among the Alaska Natives. *See* H.R.Conf.Rep. 92–746, 92d Cong., 1st Sess., 37, repr. in 1971 U.S.C.C.A.N. 2247, 2250; *City of Angoon v. Marsh,* 749 F.2d 1413, 1414 (9th Cir.1984) (recognizing that the purpose of the ANCSA is to assist Alaska Natives in achieving financial independence and self-sufficiency).

**10.** In applying Supreme Court precedent in the D.C. Circuit, Justice Scalia, then Circuit Judge Scalia, stated:

"[I]n a sense the Constitution itself establishes the rationality of the present classifi-

cation, by providing a separate federal power.... As the Supreme Court has said in rejecting equal protection challenges to legislation affecting a group which ... might otherwise qualify as a 'suspect class': [T]he Constitution itself provides support for legislation directed specifically at the Indian tribes.... [T]he Constitution therefore 'singles Indians out as a proper subject for separate legislation.' "
*United States v. Cohen,* 733 F.2d 128, 139 (1984) (holding no equal protection violation and that neither strict scrutiny nor intermediate scrutiny was applicable) (quoting from *Morton,* 417 U.S. at 552, 94 S.Ct. 2474).

The evidence presented reflects that Congress enacted the exemption for the benefit of those Native Americans who are affiliated with tribal entities as denoted by Congress. Not only is there history of affording special treatment to Alaska Natives, but also, following a report by the Alaska Federation of Natives ("AFN"), Congress found the need to form a commission, the Joint Federal–State Commission on Policies and Programs Affecting Alaska Natives. *See* P.L. 101–379, § 12(b). After holding 15 regional hearings and two statewide hearings, the commission issued its Final Report in May 1994. *See* P.L. 104–270 § 1(2). The commission's final report was consistent with the AFN's conclusions that there was a need for more jobs and economic opportunities because there was a lack of economic development opportunities for Native Americans. *See Alaska Native Commission Report Joint Oversight Hearing*, S. and H.Hrg. No. 104–52, 104th Cong., 1st Sess., at 8–9 (Nov. 16, 1995). This was done by promoting economic development, including a potential stream of revenues, that will ensure self-sufficiency for the corporation's Alaska Native shareholders. *See Pierce*, 694 F.2d at 1168 n. 10.

Pursuant to Section 8014(3), Congress has established a contracting shortcut for Native American-owned firms, which increases the likelihood of new business opportunities for them. As previously discussed, the August 2000 clarifying amendment to Section 8014(3) for Fiscal Year 2001 substituted "ownership by an Indian tribe, as defined in 25 U.S.C. 450(e), or a Native Hawaiian organization, as defined under 15 U.S.C. 647(a)(15)" for the term "Native American ownership." Amendment No. 3319, 146 Cong.Rec. S4961 (daily ed. June 12, 2000); P.L. 106–259, 114 Stat. 656, 677 (2000). This was in direct response to the filing of the case at bar.[11] *See* 146 Cong.Rec. S5019 (daily ed. June 13, 2000). Looking at Congress's intent is an aid in statutory interpretation, but has never been a requirement. *See Red Lion*, 395 U.S. at 379, 89 S.Ct. 1794. Even though a court usually seeks prior history, subsequent history may illuminate the matter. *See Hagen v. Utah*, 510 U.S. 399, 420, 114 S.Ct. 958, 127 L.Ed.2d 252 (1994) (utilizing subsequent history when interpreting a statute); *Red Lion*, 395 U.S. at 380, 89 S.Ct. 1794. In sum, the defendants and the intervenor-defendants succeed on the merits by proving that there is no genuine issue of material fact as to whether Section 8014(3) violates equal protection. *See* Fed.R.Civ.P. 56(c); *Celotex Corp.*, 477

---

11. MR. STEVENS:

... It has come to my attention that a lawsuit has been filed challenging the Native American exception in section 8014(3) as a racially-based preference that is unconstitutional. That challenge is simply inconsistent with the well-established body of Federal Indian law and numerous rulings of the U.S. Supreme Court. The Native American exception ... is intended to advance the Federal Government's interest in promoting self-sufficiency and the economic development of Native American communities. ... While I believe that the provision is clear, we propose adoption of the amendment before us today to further clarify that the exception for Native American-owned entities in section 8014 is based on a political classification, not a racial classification.

Because my colleague was Chairman of the Subcommittee on Defense Appropriations in 1990 ... I would like to know whether my understanding of the purpose and intent of section 8014 is consistent with the original purpose and intent. ...

MR. INOUYE:

My chairman is correct. ... Today, Federal laws like section 8014, are the means by which the United States carries out its trust responsibilities and the Federal policy of self determination and economic self-sufficiency.

*See* 146 Cong.Rec. S5019 (daily ed. June 13, 2000).

U.S. at 322, 106 S.Ct. 2548; *Diamond*, 43 F.3d at 1540. " 'On rational basis review ... a statute [such as § 8014(3) ] ... comes to us bearing a strong presumption of validity, and those attacking the rationality of the legislative classification have the burden to negative every conceivable basis which might support it.' " *Calloway v. Dist. of Columbia*, 216 F.3d 1, 8 (D.C.Cir.2000) (quoting *Federal Communications Comm'n v. Beach Communications, Inc.*, 508 U.S. 307, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)). Thus, the court grants the defendants' and intervenor-defendants' respective motions for summary judgment. No reasonable trier of fact could find, looking at all the evidence, including the history, with all inferences in favor of the plaintiffs, that the United States's trust obligation and the self-determination of Native Americans are not reasonably accomplished by enacting the Section 8014(3) preference. *See Koniag*, 39 F.3d at 996–97.

Conversely, the plaintiffs fail to show that the Section 8014(3) mechanism is wholly irrational or arbitrary. This is especially clear in light of the fact that the reservation system is no longer effective in accomplishing Congress's legitimate goal. *See* 146 Cong.Rec. S5019 (daily ed. June 13, 2000); *cf. Williams v. Babbitt*, 115 F.3d 657, 666 (9th Cir.1997). Further, the ANCSA scheme is a tool that aids companies like Chugach in attaining economic self-sufficiency. *See City of Angoon*, 749 F.2d at 1414. The Congress needs room to function and, in the arena of Native American legislation, our Supreme Court has stated: "Of necessity the United States assumed the duty ... and with it the authority to do all that was required to perform that obligation and to prepare the Indians to take their place as independent, qualified members of the modern body politic...." *Bd. of County Comm'rs v. Seber*, 318 U.S. 705, 715, 63 S.Ct. 920, 87

L.Ed. 1094 (1943). Furthermore, the Court has recognized that "[i]f these laws [singling out Native Americans], derived from historical relationships and explicitly designed to help only [Native] Indians, were deemed invidious racial discrimination, an entire Title of the United States Code (25 U.S.C.) would be effectively erased and the solemn commitment of the Government toward the Indians would be jeopardized." *Simmons v. Eagle Seelatsee*, 244 F.Supp. 808, 814 n. 13 (E.D.Wash. 1965), quoted in *Mancari*, 417 U.S. at 553, 94 S.Ct. 2474.

In looking at the evidence in the light most favorable to the plaintiffs, no reasonable trier of fact could find that Section 8014(3) is not a reasonable method for fulfilling Congress's special responsibilities to Alaska Natives. *See* 43 U.S.C. § 1601 *et seq.* In fact, the preference is constitutional because it is a reasonable tool to further these enumerated goals. *See id.; Marsh*, 749 F.2d at 1414. Consequently, the court denies the plaintiffs' motion for summary judgment and grants the defendants' motion for summary judgment, thereby granting the intervenor-defendants' motions for summary judgment as well.

**E. The Court Grants the Defendants' and Intervenor–Defendants' Motions for Summary Judgment on Count Two, and Denies the Plaintiffs' Motion for Summary Judgment on Count Two Because There is No Substantive Due Process Right to Federal Employment**

█ Count Two alleges the violation of substantive due process as guaranteed by the Fifth Amendment. *See* Am.Compl. ¶ 36. The Supreme Court is reluctant to announce new fundamental rights that invoke substantive due process protection and has not stated that there is such a

right to federal employment. Absent such precedent, the court declines to extend those rights for which there is no precedent. Through their alleged denial of a fundamental interest in federal employment, the plaintiffs attempt to trigger strict scrutiny analysis. *See* Pls.' Mem. in Supp. of Mot. for Summ.J. at 39. The defendants, however, oppose the plaintiffs' argument that strict scrutiny applies to the given facts. *See* Defs.' Mem. in Supp. of Mot. for Summ.J. at 10. The defendants also argue that there is no fundamental right to federal employment that would entitle the plaintiffs' loss of federal employment to substantive due process protection. *See id.* The intervenor-defendants concur with the defendants on this point. *See* Int.–Defs.' Mem. in Supp. of Mot. for Summ.J. at 37. The court agrees with the defendants' position since there is, indeed, no case law that recognizes a fundamental right to federal employment, only a procedural due process guarantee. *See Roth,* 408 U.S. at 589, 92 S.Ct. 2701. Therefore substantive due process analysis does not apply here. *See id.*

 Nonetheless, as alluded to previously, there is a second component to due process analysis, otherwise referred to as procedural due process. *See id.* When an underlying law is subject to substantive due process analysis and survives strict scrutiny, it must also be implemented in a fair manner. *See id.* As such, the second proscription under the Due Process Clause of both the Fifth and Fourteenth Amendments is any measure that denies procedural due process. *See Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Property interests are not generated by the Constitution, "[r]ather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law rules or under-

standings that support claims of entitlement to those benefits." *Roth,* 408 U.S. at 577, 92 S.Ct. 2701 (holding that the respondent did not have a property interest—the substantive component—sufficient to require a hearing—the procedural component—when the government declined renewal of his contract of employment). Since the plaintiffs have not raised a denial of procedural due process, the court need not raise that issue *sua sponte.* Therefore, the court enters summary judgment on Count Two for the defendants and the intervenor-defendants, and denies summary judgment as to the plaintiffs on Count Two.

## IV. CONCLUSION

For the foregoing reasons, the court grants the defendants' motion for summary judgment and grants the intervenor-defendants' motion for summary judgment on both Counts One and Two. Accordingly, the court denies the plaintiffs' motion for summary judgment on both Counts One and Two. An order directing the parties in a manner consistent with this Memorandum Opinion is separately and contemporaneously issued this 29 day of March 2002.